**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Marizu Jite OGBUEHI, aka Morris Ogbuehi, aka Mariczu Jite Ogbuehi, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Payton Eugene TEAGUE, aka Eugene P. Teague, Defendant–Appellant.**

Nos. 93–50109, 93–50243.

United States Court of Appeals,
Ninth Circuit.

March 15, 1994.

---

**7.** Attorneys' fees may not be awarded to Oxford House under 42 U.S.C. § 3613(c)(2). It must await the outcome of further proceedings.

Eugene G. Iredale, San Diego, CA, for defendant-appellant Marizu Jite Ogbuehi.

Debra A. DiIorio, DiIorio & Hall, San Diego, CA, for defendant-appellant Payton Eugene Teague.

John R. Kraemer, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: SNEED, THOMPSON, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Marizu Ogbuehi, Eugene Teague, and Rosalie Williams were arrested by Customs Agents as Teague and Williams attempted to smuggle 2.5 pounds of heroin across the border at the San Ysidro Port of Entry. After his motion to suppress was denied, Teague entered a conditional guilty plea to conspiracy to import heroin (21 U.S.C. §§ 952, 960,

963), importation of heroin and aiding and abetting (21 U.S.C. §§ 952, 960 and 18 U.S.C. § 2), conspiracy to possess heroin with intent to distribute (21 U.S.C. §§ 841(a)(1), 846), and possession of heroin with intent to distribute and aiding and abetting (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2). Teague appeals the denial of his motion to suppress, arguing that Customs Agents lacked a reasonable suspicion to detain him once he had cleared inspection, even though he was still on Port of Entry property; and that his post-arrest statements were taken in violation of his *Miranda* rights after he had made an equivocal request for counsel. He also argues that he should be sentenced based only on the heroin he carried rather than the total amount he and Williams carried.

Ogbuehi was convicted by a jury of the same counts. He argues that the district court erred in refusing to examine and require the prosecutor to turn over his notes from pretrial interviews with Rosalie Williams under the Jencks Act, and in admitting "drug courier profile" testimony and testimony regarding the street value of the heroin.

We affirm Teague's convictions and sentence. We remand to the district court so that it can determine *in camera* whether the withheld notes were "statements" under the Jencks Act, and, if so, whether it was harmless error not to turn them over to Ogbuehi.

## I

Ogbuehi, Teague, Rosalie Williams, and Linda Williams (no relation) lived around Atlanta, Georgia. Ogbuehi, a resident alien from Nigeria, recruited Teague and the two Williamses to carry heroin into the United States from Nigeria. Each was recruited separately; none of the three knew of the others when he or she agreed to smuggle the heroin. The recruits met each other for the first time after they arrived in Nigeria. They stayed for approximately two weeks, and, while there, Rosalie and Linda were each given a belt and girdle filled with 1.5 pounds of heroin. Teague got a pair of shoes with a pound of heroin in the soles.

Ogbuehi, Teague, and the Williamses then began their trip back to the United States. Ogbuehi carried no drugs. From Nigeria they flew to Spain, Mexico City and Tijuana, sitting in different parts of the plane to avoid suspicion.

They took a bus to the Port of Entry in Tijuana but left most of their luggage on the bus and walked through the pedestrian inspection areas. Teague walked through separately. The two Williamses walked through a pedestrian lane without incident after showing their Georgia driver's licenses. When inspected, Ogbuehi showed Customs Agent Toothman his green card and told him he was born in Nigeria. Toothman thought that the Williamses and Ogbuehi were a group, and that Ogbuehi appeared "overdressed for the occasion." He therefore sent Ogbuehi to secondary inspection.

In secondary, Ogbuehi told Customs Agent Blackburn he was a Nigerian citizen who lived in Georgia. Ogbuehi was cooperative but repeatedly stated that he had to hurry or he would miss his plane. He also said that he had traveled from Atlanta to Mexico City to Tijuana with some American friends from whom he had been separated.

During the inspection, Blackburn found Ogbuehi's passport which showed numerous trips in and out of Nigeria as well as his recent travels by way of Spain. When asked why he neglected to mention his recent trip to Nigeria and Spain, Ogbuehi said he forgot. When asked about his luggage, he said he left it on the bus.

Customs Agent Proctor overheard this and went outside to question the bus drivers. One driver said that he had two black male and two black female passengers who sat in the back of the bus and left their luggage. When the luggage was brought to secondary, Ogbuehi identified only one of the bags as his and said he did not know who owned the others.

Ogbuehi again said that he was going to miss his plane. When Blackburn examined Ogbuehi's ticket, however, he saw that Ogbuehi's reservations were for a flight that left two days earlier. Proctor then told Toothman to find the two women who had preced-

ed Ogbuehi in line. Toothman went outside the Customs building and saw Teague and Rosalie Williams hugging and kissing. He also saw Linda Williams leave in a car.

Toothman approached Teague and Williams and asked them to come back into the Customs building to clear up some questions about the luggage. When they returned to secondary inspection, Teague and Williams denied knowing Ogbuehi and vice versa. Agent Blackburn, after looking at Williams's and Teague's identification again, noticed that all three were from Georgia. He then found Williams's passport and airplane tickets which showed an itinerary identical to Ogbuehi's. The two were asked again whether they knew Ogbuehi, and they again denied that they did. However, they stated that the remaining luggage belonged to them.

A Customs Agent conducted a pat-down search of Williams and discovered the belt and girdle under her clothes. After a narcotics dog alerted on Williams, the belt and girdle were opened and the heroin discovered. The dog then alerted on Teague. He was strip-searched, and the heroin was found in his shoes. All three were arrested. After her arrest, Williams implicated Ogbuehi as the organizer of the conspiracy. Teague also confessed to his involvement.

## II

### A

Ogbuehi first argues that the district court erred in refusing to order the prosecutor to turn over statements made by Rosalie Williams before trial. The Assistant United States Attorney ("AUSA") interviewed Williams on two different occasions. Ogbuehi moved for *in camera* review and production of the notes on the ground that they were "statements" under the Jencks Act, 18 U.S.C. § 3500.[1] The district court declined to review them unless a foundation were laid that Williams had adopted the notes as her statement.

The AUSA had taken notes of the Williams interviews on his word processor, but represented that they were not "verbatim in the sense of a transcript or a deposition, you know, my question in quotes, her answer in quotes." He also stated that the notes were never shown to Williams. Williams testified that the AUSA would "from time to time" read something back to her and ask if he had it right. She would say, "Yes, that's what I said" or if it were "no," he would correct it. The court rejected Ogbuehi's renewed request for lack of foundation, noting that there was nothing to show that Williams had read the full statement and adopted it or that it was a verbatim statement that she was allowed to review and adopt.

Ogbuehi now argues that this case is controlled by *Goldberg v. United States*, 425 U.S. 94 (1976).[2] We agree. In *Goldberg*, prosecutors took notes during a witness interview. *Id.* at 100–01. They "occasionally read [the notes] back to [the witness] to see whether or not they correctly understood what [he was] saying" and he "either correct[ed] them or sa[id], 'Yes, that's right,' or 'No, that's not right because it went this way, I believe,' words to that effect." *Id.* The Court held that this testimony "raised a sufficient question under the Act to require the trial judge to conduct such an [*in camera*] inquiry, and [so] ... a remand for such an inquiry by the District Court is required to determine whether petitioner's motion should have been granted." *Id.* at 109. Relying on *Goldberg*, we subsequently held in *United*

1. Section 3500(e) provides in relevant part:
    (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
        (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
        (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an

oral statement made by said witness and recorded contemporaneously with the making of such oral statement....
18 U.S.C. § 3500(e)(1), (2) (1988).

2. It would have been helpful had the same authority been called to the attention of the district court. This would not only have given the trial judge an opportunity to consider its application, but would likely have averted the need for appellate review and remand on the point.

*States v. Boshell,* 952 F.2d 1101, 1105 (9th Cir.1991), that notes which are occasionally read back to a witness to confirm their accuracy before being dictated into a tape recorder constitutes adoption by the witness.

The government relies on the *Goldberg* concurrences which would have adopted more stringent requirements for the showing needed to prove that a statement is producible and a higher standard for *in camera* review. The full Court has not, however, embraced this view.

The government also asks us to follow the Fifth Circuit's test that, "[i]n order for interview notes to qualify as a statement under § 3500(e)(1) the witness must have signed, read, or heard the entire document read." *United States v. Pierce,* 893 F.2d 669, 675 (5th Cir.1990). Since *Pierce* conflicts with *Boshell* and relies on the *Goldberg* concurrences rather than the majority, we cannot follow it.[3] Based on the majority opinion in *Goldberg,* Ogbuehi laid a sufficient foundation to require *in camera* review. *See also United States v. Rewald,* 889 F.2d 836, 867 (9th Cir.1989), *cert. denied,* 498 U.S. 819 (1990) ("prima facie showing" requires *in camera* review).

**B**

■ Ogbuehi argues that, based on *Goldberg,* his conviction must be reversed if the district court erred. The government argues that, if the court erred, we need not reverse or remand because the error was harmless. Both views are incorrect. *Goldberg* requires us to remand so the district court can conduct an *in camera* review to determine if the AUSA's notes are "statements." *Goldberg,* 425 U.S. at 109. The district court should conduct this "belated *in camera* review" in the first instance. *United States v. Long,* 715 F.2d 1364, 1367 (9th Cir.1983); *accord United States v. Wallace,*

848 F.2d 1464, 1471 (9th Cir.1988). "It is not an appellate court's role to determine that a document we have not seen is or is not a 'statement,' or is or is not relevant to the testimony adduced at trial." *United States v. Allen,* 798 F.2d 985, 999 (7th Cir.1986).

On remand, the district court should determine whether the notes were "statements," or, assuming they were, whether the failure to produce them was harmless error. Though "the harmless-error doctrine must be strictly applied in Jencks Act cases," *Goldberg,* 425 U.S. at 111 n. 21, a new trial is required "only if the court concludes that a producible statement existed and that substantial rights of appellant were affected by the failure to make that statement available for his use in cross-examination." *United States v. Johnson,* 521 F.2d 1318, 1320 (9th Cir.1975); *see also Wallace,* 848 F.2d at 1471 (although Jencks violations are normally non-constitutional error, Sixth Amendment could be implicated; district court to determine which standard to apply after examining notes *in camera*). Deciding whether any error was harmless necessarily requires determining whether the statement could have been used for impeachment purposes since disclosure of a witness's statements is required "for impeachment purposes only." *United States v. Dupuy,* 760 F.2d 1492, 1496 (9th Cir.1985). Thus, on remand the court may, in its discretion, assume without deciding that the notes are a "statement" and then determine whether the failure to produce them amounted to harmless error.

If the court concludes, after review, that the notes are not "statements" and should not be produced, or that the failure to produce the notes was harmless error, it is to enter a new judgment of conviction; otherwise, it is to vacate the judgment of convic-

---

3. Other cases the government cites are inapposite. In *United States v. Gross,* 961 F.2d 1097, 1105 (3d Cir.), *cert. denied,* 113 S.Ct. 439 (1992), the district court found that notes were not Jencks material because the witness signed an affidavit saying he did not adopt any of the prosecutor's notes as his own statements. After *in camera* review, the court also found the notes were not a substantially verbatim recital of the

witness's statements to prosecutors. Nor are cases such as *United States v. Spencer,* 618 F.2d 605 (9th Cir.1980) and *Wilke v. United States,* 422 F.2d 1298 (9th Cir.1970) (per curiam), which hold that rough notes are not producible, helpful, because they do not address the argument that the witness approved of the statement or had it read back to him.

tion and grant Ogbuehi a new trial.[4] *Goldberg,* 425 U.S. at 111–12.

## III

■ Ogbuehi argues that "profile" testimony by DEA Agent Conklin together with the prosecution's using the retail value of the heroin instead of its wholesale value in closing argument was prejudicial error requiring reversal. Conklin testified that western Africans, particularly Nigerians posing as exporters, ship heroin from Thailand to the United States via Nigeria and Europe. He explained how western Africans use American couriers to carry drugs into the United States. He said that the DEA has noticed a "big influx in the west African smuggled heroin" being walked across the border to avoid showing a western African passport at an airport with more security, and that "Nigerians in particular are using a lot of couriers now because they are aware that they are on our profile." Finally, he testified that smugglers using couriers "follow them to insure that they don't run off with the drugs." Ogbuehi objected on numerous grounds that were overruled, but not on the basis of Fed. R.Evid. 403; therefore we review for plain error. *United States v. Gomez–Norena,* 908 F.2d 497, 499–500 (9th Cir.), *cert. denied,* 498 U.S. 947 (1990).

Even if Conklin's testimony ran afoul of our rule that drug courier profile testimony may not be used as substantive evidence of guilt, *United States v. Lim,* 984 F.2d 331, 335 (9th Cir.), *cert. denied,* 113 S.Ct. 2944 (1993), admitting this evidence did not affect Ogbuehi's substantial rights so as to "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano,* 113 S.Ct. 1770, 1779 (1993) (quotation marks omitted). Rosalie Williams's testimony, if believed, was sufficient to establish Ogbuehi's guilt. Therefore there is no plain error, and no reason for reversal.

■ Conklin's valuation of the heroin assumed that it was cut repeatedly and sold on the street, which Ogbuehi argues was prejudicial. However, DEA agents can testify as to the street value of narcotics, *United States v. Agyen,* 842 F.2d 203, 205 (8th Cir.), *cert. denied,* 486 U.S. 1035 (1988), and counsel can argue reasonable inferences from it. There was no abuse of discretion in admitting the evidence or allowing argument about its significance.

## IV

■ Teague argues that the Customs Agents lacked a reasonable suspicion to detain or search him again, after he had already passed through the Customs inspection, in violation of the Fourth Amendment. The government counters that reasonable suspicion was unnecessary because the Customs Agents conducted a border search.[5] We hold that the Customs Agents did not need reasonable suspicion because they conducted a valid border search.

■ Whether a warrantless search is valid is a question we review de novo. *United States v. Cardona,* 769 F.2d 625, 628 (9th Cir.1985). We review the underlying factual determinations for clear error. *United States v. Espinosa,* 827 F.2d 604, 608 (9th Cir.1987), *cert. denied,* 485 U.S. 968 (1988).

Teague argues that, because he passed through one inspection, any further inspection must be an "extended border search" which requires that agents have a reasonable suspicion that Teague was engaged in criminal activity. Extended border searches take place "a greater spatial and temporal distance from the border than a search at the functional equivalent of the border" and therefore require reasonable suspicion. *Cardona,* 769 F.2d at 628; *see also United States v. Espericueta–Reyes,* 631 F.2d 616, 619–21 (9th Cir.1980).

■ Some searches, though not *at* the border, occur so spatially and temporally close

---

4. We conclude that Ogbuehi's other arguments do not merit reversal.

5. The government also argues that Teague's return to the secondary inspection area was con-

sensual and that the Customs Agents had reasonable suspicion to detain Teague. Because we hold that this was a border search, we do not reach these other arguments.

to it that they are considered border searches. "The fact that some search occurred at the time of the initial border crossing simply does not prevent later searches from coming under the rules of border searches." *United States v. Alfonso,* 759 F.2d 728, 735 (9th Cir.1985); *see United States v. Ogueri,* 798 F.2d 452, 453 (11th Cir.1986) (second customs search conducted 20 yards beyond customs enclosure was valid as search at functional equivalent of border); *United States v. Ramos,* 645 F.2d 318, 320–21 (5th Cir. Unit B 1981) (second customs search conducted in airport lobby 30 minutes after leaving customs enclosure and after checking into hotel still valid as search at functional equivalent of border); *United States v. Mejias,* 452 F.2d 1190, 1193 n. 1 (9th Cir.1971) ("The term 'border' logically includes the check point at the point of entry as well as a reasonable extended geographic area in the immediate vicinity of any entry point.").

Without defining the outer limits of these searches, we have no trouble concluding that Teague's search, occurring minutes after he crossed the border and 60 feet from the Customs Office door, was a border search requiring no suspicion. Toothman needed no suspicion to ask Teague to return to secondary inspection. Teague's detention accordingly did not violate the Fourth Amendment.

### V

■ Teague contends that the district court erred by refusing to suppress statements made after an equivocal request for an attorney. After his arrest, Teague was interrogated by Customs Agents Deal, Barron and Knight. Deal began by reading the standard *Miranda* form. When Deal informed Teague of his right to an attorney, Teague asked, "Do I need a lawyer?" or "Do you think I need a lawyer?" Deal told him that "that was a question that only he could answer," and "I can't answer that one for you." At that point, Knight said, "You can go ahead and answer questions and . . . stop and ask for a lawyer later if you like." Deal agreed and said he would discuss that later. Barron then stated, "Now is the time to make a statement if you want to make it."

In response, Deal "backed up and . . . reread that line" about Teague's right to a lawyer and then continued to read the form. Teague asked no more questions. After Deal finished reading, Teague said, "Where do I sign? I'll talk." At no other time did he ask for an attorney or ask Deal to stop questioning him, or receive promises in return for his statements.

Teague contends that Deal's statement that "only [Teague] can answer that," coupled with the statements made by the other agents, were improper responses to his request and that Deal's restatement of Teague's right to counsel did not remedy the situation. We disagree.

■ We review for clear error the district court's factual finding concerning the words a defendant used to invoke the right to counsel. *United States v. De La Jara,* 973 F.2d 746, 750 (9th Cir.1992). Whether those words actually invoked the right to counsel is reviewed de novo. *Id.*

Based on the words used, Teague's question, "Do I need a lawyer" or "Do you think I need a lawyer" does not rise to the level of even an equivocal request for an attorney. In determining whether a defendant has invoked his right to counsel, we review his words "as ordinary people would understand them." *De La Jara,* 973 F.2d at 750 (quotation omitted). If the defendant's request clearly " 'expresse[s] his desire to deal with the police only through counsel,' " then all interrogation must cease." *Id.* (quoting *Edwards v. Arizona,* 451 U.S. 477, 484 (1981)). "If the desire is not clearly expressed, then further questioning must be limited to clarifying the defendant's intention." *Id.; see also United States v. Fouche,* 833 F.2d 1284, 1287 (9th Cir.1987), *cert. denied,* 486 U.S. 1017 (1988) (*Fouche II* ). The agents at this point "must not coerce or intimidate the suspect into waiving his rights." *Fouche II,* 833 F.2d at 1287.

While we have held that a suspect saying that he "might want to talk to a lawyer" is an equivocal request, *United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985), we have also said that asking "if he should see a lawyer" does not "rise to the level of an

equivocal request for counsel." *Norman v. Ducharme,* 871 F.2d 1483, 1486 (9th Cir. 1989), *cert. denied,* 494 U.S. 1031 (1990). We have stated, without deciding, that "Should I call my lawyer?" "might not even constitute an equivocal invocation, and thus might require no clarification by the interrogating officers." *De La Jara,* 973 F.2d at 750.

Based on *Dumarche* and *De La Jara,* Teague's question does not rise to the level of an "equivocal request." Looking at the words as "ordinary people would understand them," *De La Jara,* 973 F.2d at 750, Teague asked Deal for his opinion on the need for an attorney. Deal responded correctly. Teague asked for advice, not an attorney. Therefore, failing to suppress Teague's statements was not error.

## VI

 Teague argues that the court erred at sentencing by including the heroin possessed by Rosalie Williams as "relevant conduct" since that heroin was not encompassed within Teague's conspiratorial agreement. The district court found that Teague agreed only with Ogbuehi to import the heroin, but he became aware of Rosalie Williams by the time they got to Nigeria. After that, they aided and abetted each other. In addition, the court found that Williams's drug courier activities furthered their jointly undertaken criminal activity and were reasonably foreseeable. As a result, the court sentenced Teague based on the total amount of heroin both he and Williams carried pursuant to U.S.S.G. § 1B1.3(a)(1). Teague argues that he should be sentenced based only on the amount of heroin he personally carried. This contention lacks merit.

 We review the district court's interpretation and application of the Sentencing Guidelines de novo. *United States v. Fagan,* 996 F.2d 1009, 1017 (9th Cir.1993). We review its factual findings regarding the sentence for clear error. *United States v. Chapnick,* 963 F.2d 224, 226 (9th Cir.1992).

Section 1B1.3(a)(1) provides for inclusion of all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity that occurred during the commission of the offense of conviction. An Application Note describes the analogous example of couriers backpacking marijuana across the border together, indicating that couriers are responsible for the aggregate amount of marijuana between them. U.S.S.G. § 1B1.3, comment. (n. 2(c)(8)). "This court must apply the commentary to Guidelines sections unless it is inconsistent with the text of the Guidelines." *United States v. Taylor,* 984 F.2d 298, 300 (9th Cir.1993).

The cases upon which Teague relies are inapposite. This is not a situation in which the defendant is charged based on actions that took place before he entered the conspiracy, *United States v. Petty,* 992 F.2d 887, 891 (9th Cir.1993), or that took place after his participation ceased, *United States v. Navarro,* 979 F.2d 786, 789 (9th Cir.1992). Though the court found that Teague only agreed with Ogbuehi, the scope of his criminal conduct is determined by considering "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, comment. (n. 2). Based on Teague's conduct, he and Williams were both aware that they were smuggling heroin and both aided and abetted each other. Therefore we affirm Teague's sentence based on the total amount they carried.

AFFIRMED in part and REMANDED in part as to Ogbuehi; AFFIRMED as to Teague.