**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Juan Miguel PALAFOX–MAZON; Carlos Gamboa–Miranda; Ramon Garcia–Montijo, Defendants–Appellees.**

**No. 99–10026.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1999.

Filed Jan. 3, 2000.

---

Amy B. Krauss, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellant.

Thomas G. Hippert, for the defendants-appellees (argument), Arthur J. Hutton, for Gamboa–Miranda (brief), and Enrique Gonzales, for Palafox–Mazon (brief).

Before: PREGERSON and WIGGINS, Circuit Judges, and CARTER, District

Judge.[1]

PREGERSON, Circuit Judge:

Defendants/Appellees Juan Miguel Pala-fox–Mazon, Carlos Gamboa–Miranda, and Ramon Garcia–Montijo backpacked into the United States carrying approximately 47 pounds of marijuana each and were arrested in Arizona by the U.S. Border Patrol. After the government dismissed the conspiracy charge against them, each Defendant pleaded guilty to one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). At sentencing, the district court found that the Defendants had not "jointly undertaken criminal activity" within the meaning of U.S.S.G. § 1B1.3(a)(1)(B). The court therefore determined each Defendant's offense level based on the quantity of marijuana each individually carried in his backpack into the United States, rather than on the total amount of marijuana recovered from all the backpacks. The government asserts that the district court committed clear error in finding that the Defendants had not implicitly and willfully participated in a joint criminal enterprise. We disagree.

■ Given the factual circumstances of this case, we hold that the district court did not clearly err in concluding that the Defendants did not undertake joint criminal activity within the meaning of U.S.S.G. § 1B1.3(a)(1)(B) and the accompanying Commentary. Accordingly, we hold that the district court did not err in sentencing each Defendant on the basis of the amount of marijuana that each personally carried, rather than on the total amount of marijuana that the U.S. Border Patrol recovered at the scene.

## I.

The district court essentially found that the Defendants were human "mules," individually hired to transport individual backpacks of marijuana into the United States. A drug smuggler named Pedro Garcia independently and individually recruited each Defendant on different days to carry one bag of marijuana from Nogales, Mexico to the United States. Garcia told each Defendant that he would receive $800 for doing so. None of the Defendants had any criminal history, but each agreed to Garcia's proposition because each desperately needed money to support his family.

Garcia separately told each Defendant to meet him at a house on a given day. When they did so, they discovered that six persons had shown up at the house, all of whom were immediately taken by Garcia to a location in the desert west of Nogales where a guide awaited them.

None of the Defendants had any role in preparing or planning the importation of the marijuana. Each was simply given a backpack and told to follow a guide that Garcia selected to an unknown destination, via an unknown route to the United States. Garcia did not accompany them.

After walking for two days, the Defendants stopped to sleep under a tree in Ramanote Canyon near Nogales, Arizona. The guide left them there, either to scout out their final destination or because he perceived the "danger." The U.S. Border Patrol awakened them and arrested the three Defendants. The other three backpackers fled the scene and avoided apprehension. The border patrol never found the guide.

When the border patrol arrested the Defendants, they seized each Defendant's backpack along with the backpacks abandoned by the others who had fled. In total, the border patrol seized 287.1 pounds of marijuana at the scene. Each individual backpack contained approximately 47 pounds of marijuana.

---

1. The Honorable David O. Carter, United States District Judge for the Central District of California, sitting by designation.

Upon arrest, the Defendants were taken to the Border Patrol Station, where each waived his *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) rights and admitted that he had carried a backpack containing marijuana into the United States and that he was promised $800 for doing so.

Each Defendant was charged with one count of conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846 (Count I), and one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count II). The government dismissed the conspiracy charges, and each Defendant pleaded guilty to Count II of the indictment. There was no written plea agreement.

Under U.S.S.G. § 2D1.1(a)(3), the offense level for a defendant convicted of a drug trafficking offense is determined by the quantity of drugs involved in the offense. This quantity may include both drugs with which the defendant was directly involved and any drugs that can be attributed to the defendant as part of his relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, the probation office in its Presentence Report (PSR) applied U.S.S.G. § 2D1.1(a)(3) and U.S.S.G. § 1B1.3(a)(1)(B) and recommended an offense level of 26 for each Defendant on the basis of the total amount of marijuana seized. In addition, the PSR stated that each Defendant qualified for a three point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), and a two point reduction as a "safety valve" pursuant to U.S.S.G. § 2D1.1(b)(6).[2] Combining the adjusted base level of 21 with a criminal history category of I, the probation officer determined the guideline range for each Defendant to be 36 to 46 months.

In their sentencing papers, Defendants urged the district court to use the amount of marijuana that each individually carried, rather than the combined amount, to determine their base offense levels. The government objected to any downward departure or adjustments from the guideline range that the probation office had recommended.

The district court agreed with the Defendants' position. The court found that:

It is clear, at least in this Court's mind, that neither one of these individuals owned the marijuana that was involved . . . that their only purpose was in transporting the marijuana across the border. They did so in backpacks.

There is no evidence to this Court to suggest that [any] one had any responsibility for any of the marijuana more than . . . they [each] carried on their back. So while they were with a group of [6] people . . ., they were only responsible for what they, themselves, carried. There is nothing in the record to indicate that had one of the other persons tripped, or fallen, or otherwise become unable to go on, that either one of these three would have been—assume[d] the responsibility to take up the other pack. It's also clear to this Court that the purpose of the guide was because these three had no idea where they were going. They were following the guide because the guide knew and had more control over the situation.

It is true that the guidelines say that the court should not split a load such as this, but it appears to this Court that all of the relevant circumstances indicate that these three had no more responsibility than for that which they, themselves, carried.

On the basis of these findings, the district court set the base offense level according to the amount of marijuana each

---

**2.** The "safety valve" reduction applies where a defendant's base offense level is 26 or higher and yet the defendant's offense conduct, criminal history, and level of cooperation with the prosecution merits reducing the base offense level by two levels. *See* U.S.S.G. § 2D1.1(b)(6) (cross-referencing U.S.S.G. § 5C1.2).

Defendant individually carried and departed downward for aberrant conduct. Thus, each Defendant was sentenced to imprisonment for twelve months and one day. The government appeals only the decision to "split the load" in sentencing. This court has jurisdiction to review the district court's final judgment under 18 U.S.C. § 3742(a).

## II.

■ We review a district court's interpretation and application of the Sentencing Guidelines de novo. *See United States v. Ogbuehi*, 18 F.3d 807, 814 (9th Cir.1994). We review factual findings made at sentencing for clear error. *See United States v. Asagba*, 77 F.3d 324, 325 (9th Cir.1996). The determination of the quantity of drugs involved in an offense is a factual finding. *See id.*

> Review under the clearly erroneous standard is significantly deferential, requiring for reversal a definite and firm conviction that a mistake has been made. The standard does not entitle a reviewing court to reverse the findings of the trial court simply because the reviewing court might have decided differently.

*Id.* (citing *Concrete Pipe & Prod. v. Construction Laborers Pension Trust*, 508 U.S. 602, 623–25, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

"Under Sentencing Guideline § 2D1.1(a)(3), the base offense level of a defendant convicted of a drug trafficking offense is determined by the quantity of drugs involved in the offense." *United States v. Hernandez–Coronado*, 39 F.3d 573, 574 (5th Cir.1994) (citing U.S.S.G. § 2D1.1(a)(3)). With respect to offenses involving drugs, a "defendant is accountable for all quantities of contraband with which he was *directly involved* and, in the case of a jointly undertaken activity, all reasonably foreseeable quantities of contraband that were *within the scope of the*

*criminal activity that he jointly undertook.*" U.S.S.G. § 1B1.3 comment. n. 1 (emphasis added).

■ Before a court can hold a defendant accountable at sentencing for the "relevant conduct" of others, it must "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Id.* "In determining the scope of the criminal activity that a particular defendant agreed to jointly undertake ..., the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* After determining the scope of the criminal activity to which a defendant agreed, the court then determines whether the conduct of others was "in furtherance of the jointly undertaken criminal activity" and "reasonably foreseeable in connection with that criminal activity." *Id.* Thus, a court may sentence a defendant on the basis of the relevant conduct of others only after determining at the threshold that the defendant agreed to jointly undertake criminal activity with the others.

■ To assist the district court in determining this threshold question, the parties agreed that Commentary Example No. 8 accompanying Sentencing Guideline § 1B1.3(a)(1)(B) is instructive. Indeed, "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

Commentary Example No. 8 states:
Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border to-

gether for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of four backpacks containing marihuana (subsections (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity. In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported (subsection(a)(1)(A)). As this example illustrates, in cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.

U.S.S.G. § 1B1.3(a)(1)(B) comment. n. 2(c)(8).

After reviewing Commentary Example No. 8, the district court found that the Defendants had not undertaken joint criminal activity. We hold that the record provides ample support for the court's finding. Indeed, the only "joint" activity that we can glean from the record is that each Defendant was hired by the same person to carry the same individual amount of marijuana, and that each followed the same guide to an unknown destination in the United States.

Although the Defendants traveled in a group of six backpackers and one guide across the United States–Mexican border, the district court found that they acted separately. Each Defendant was recruited individually, and each had the criminal objective of transporting one backpack of marijuana into the United States in order to receive $800 compensation. Each Defendant knew nothing of the details of his endeavor and did not prepare or plan its execution. Indeed, none of them knew where they were going, how to get there, or what would happen after they arrived in the United States. They simply followed the guide because the "guide knew and had more control over the situation." The record suggests, moreover, that the Defendants did not know each other or care about each other before or after Garcia took them, along with the three others, to an unknown location in the desert. Indeed, the district court found that they assumed no responsibility for each other or for each other's load.

There is nothing in the record to suggest that the Defendants intended to, would have, or did in any way "coordinate their importation efforts ... for [their] mutual assistance and protection" or "aid[ ] and abet[ ] each other's actions." The record thus supports the district court's findings of fact and decision not to hold each Defendant accountable for the conduct of the others.

## A. Commentary Example No. 8

Nevertheless, the government contests this decision. It asserts that the district court committed clear error in finding that the Defendants had not willfully participated in a joint criminal enterprise because of what the government contends was their implicit agreement to jointly import the total load of marijuana recovered at the scene. The government further asserts that Commentary Example No. 8 mandates the contrary finding. We disagree.

Commentary Example No. 8 sets out two paradigmatic scenarios for cases involving persons hired to backpack a quantity of marijuana across the border from Mexico into the United States. One scenario illustrates a case in which the defendants should be found to have "engaged in

jointly undertaken criminal activity," and the other presents the contrary scenario. Commentary Example No. 8 concludes with the caveat that

> in cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) *may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.*

U.S.S.G. § 1B1.3(a)(1)(B) comment. n. 2(c)(8) (emphasis added). If the Sentencing Commission intended that all backpackers carrying marijuana from Mexico into the United States are always to be found to have jointly undertaken criminal activity, the Commentary would have said so. It does not. Instead, Commentary Example No. 8 explicitly states that the "scope" of jointly undertaken criminal activity, if any, on the part of such backpackers "may depend" on the "particular circumstances" and the "nature of the offense" conduct. The plain meaning of these words is clear: In cases involving a group of marijuana backpackers where the facts escape easy categorization, a sentencing judge may determine whether the offense "is more appropriately viewed as one jointly undertaken" or not.

This case escapes easy categorization. Its facts are a hybrid of the two scenarios described in Commentary Example No. 8. The Commentary's scenario for jointly undertaken criminal activity describes four defendants who "receive their shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection." *Id.* Each would be "accountable for the aggregate quantity of mari[j]uana" because they jointly undertook the criminal objective of importing "four backpacks containing

mari[j]uana ... and [they] aided and abetted each other's actions ... in carrying out the jointly undertaken criminal activity." *Id.* In contrast, the Commentary's scenario describing the absence of joint criminal activity, refers to four defendants who "were hired individually, transported their individual shipments at different times, and otherwise operated independently." *Id.* Under these circumstances, the Commentary suggests that "each [defendant] would be accountable only for the quantity of mari[j]uana he personally transported...." *Id.*

Here, as in the first scenario, the Defendants received "their individual shipments from the supplier at the same time." But, as in the second scenario, they were "hired individually" at different times. In walking across the border, they followed the same guide at the same time as in the first scenario. But, in keeping with the second scenario, they followed a guide that they did not know or select, to an unknown location via an unknown route, and they "otherwise operated independently." More importantly, they did not "coordinate their importation effort" for their "mutual assistance and protection" as required in the first scenario. Nor did they "aid[ ] and abet[ ] each other's actions" in any discernible way. Thus, the circumstances of this case speak directly to Commentary Example No. 8's caveat.

## B. Relevant Case Law

Few cases have interpreted Commentary Example No. 8. The government asserts, however, that one previous Ninth Circuit case, a Fifth Circuit case, and a Tenth Circuit case suggest that the district court erred. Again, we disagree. The circumstances in this case are distinguishable from those in the cases on which the government relies.

The Ninth Circuit case of *United States v. Ogbuehi* was a heroin importation case involving three defendants whom custom agents arrested for attempting to smuggle 2.5 pounds of heroin across the border at

the San Ysidro Port of Entry. *See* 18 F.3d 807, 807 (9th Cir.1994). Codefendant Teague pleaded guilty to conspiracy to import heroin, importation of heroin, aiding and abetting the importation of heroin, conspiracy to possess heroin with intent to distribute, possession of heroin with intent to distribute, and aiding and abetting the possession of heroin with the intent to distribute. *See id.* at 809. Nevertheless, Teague argued that the district court should have sentenced him only on the basis of the heroin that he personally carried, rather than on the total amount that he and his codefendant Williams carried. *See id.*

Like the Defendants in the present case, Teague and Williams were recruited separately by the same person. *See id.* But thereafter the factual circumstances of the two cases diverge. In *Ogbuehi,* Teague and Williams were initially recruited in Atlanta and then flew to Nigeria, where they met for the first time and stayed for two weeks before beginning their smuggling venture back to the United States. *See id.* Before the defendants departed from Nigeria, Ogbuehi gave Williams a belt containing heroin and Teague a pair of shoes containing heroin. *See id.* Teague, Williams, and Ogbuehi traveled together throughout their trip back to the United States, flying through Spain, Mexico City, and Tijuana—although they sat separately "to avoid suspicion." *Id.*

After arriving in Tijuana, they took a bus to the Port of Entry in Tijuana, where Ogbuehi drew suspicion as he walked through the pedestrian inspection area. *See id.* Customs agents stopped and questioned Ogbuehi. *See id.* After he admitted traveling on a bus "with some American friends," customs agents interviewed the bus driver. The bus driver suggested that Ogbuehi had sat in the back of the

bus with Teague and Williams and that they had left their luggage on the bus. Thereafter, a custom agent spotted Teague and Williams "hugging and kissing" outside the Customs building. *Id.* at 810. A pat-down search, followed by a dog-sniffing, alerted the agents to the heroin and resulted in Teague's and Williams' arrests. *See id.* "Williams implicated Ogbuehi as the organizer of the conspiracy. Teague also confessed to his involvement." *Id.*

On the basis of these facts, the district court found that Teague had agreed to joint criminal activity with Ogbuehi. *See id.* at 814. The court further found that Teague and Williams knew that both were smuggling heroin and that they had "aided and abetted each other" in executing their joint criminal objective. *Id.*

In the present case, the record does not suggest—and the district court did not find—that the Defendants in any way "aided and abetted" each other in executing a joint criminal objective. The Defendants here did not travel together for weeks, through multiple airports and cities as the defendants in *Ogbuehi* did. Here, unlike in *Ogbuehi,* no witnesses testified that the Defendants coordinated their travel, acted in concert, or interacted intimately. Whereas Ogbuehi led, guided, and assisted Teague and Williams throughout their journey to the United States, here Pedro Garcia, the recruiting drug smuggler, did not lead or assist the Defendants at all. The Defendants simply followed the same unknown guide, not because they agreed to do so for their "mutual assistance and protection," but because the guide knew where he was going and they did not. Finally, unlike the defendants in *Ogbuehi,* the Defendants here did not plead guilty to multiple conspiracy charges. Indeed, ultimately, all conspiracy charges were dismissed in this case.[3]

---

**3.** We recognize that the Sentencing Guidelines define "jointly undertaken criminal activity" as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3 comment. n. 2. The fact that the conspiracy charges against the Defendants were dismissed therefore has no direct bearing on the correctness of the district court's decision.

The Fifth Circuit case on which the government relies arguably supports the district court's decision in this case. *United States v. Hernandez-Coronado* implicitly stands for the proposition that an individual marijuana backpacker, who intends only to carry the amount of marijuana that he personally backpacks into the United States from Mexico, and who does not "accept his role within [a] larger unit" of backpackers by, for example, assuming the role of a guide and travel coordinator for the group, should only be held accountable for his individual load of marijuana under U.S.S.G. 1B1.3 (a)(1)(B). 39 F.3d at 574. In *Hernandez-Coronado*, the defendant agreed to carry a package of marijuana from Mexico to the United States for $300. *See* 39 F.3d at 573. The defendant and his recruiter joined eleven other individuals, and all thirteen individually carried 30 pound bags of marijuana. *See id.* at 574. Hernandez, unlike any of the Defendants in the present case, assumed the role of the guide and travel coordinator for his group. *See id.* The Fifth Circuit acknowledged that "Hernandez originally intended to carry only his bundle," but concluded that he joined a group and "accepted his role within the larger unit.... [He] knew about the other criminal actors, with whom he walked while carrying the marijuana. [He] relied on the others for support and assistance, and they relied on him, as demonstrated by [his] advice to travel at night to avoid detection." *Id.*

Here, there is no evidence suggesting that the Defendants accepted their "role within a larger unit" or that any one Defendant acted as a guide or travel coordinator for the others. Indeed, the district court found that "these three had no idea where they were going. They were following the guide because the guide knew and had more control over the situation."

Finally, the Tenth Circuit case on which the government relies is similarly distinguishable. Unlike the Defendants here, the defendants in *United States v. Dominguez-Carmona*, 166 F.3d 1052 (10th Cir. 1999) were recruited at the same time by the same drug smugglers to carry marijuana in backpacks from Mexico to the United States. *See* 166 F.3d 1052, 1054 (10th Cir.1999). From the outset, they were instructed to meet and work together as a group, and they mutually "agree[ ] to carry backpacks across the border and turn over the contents to a United States contact." *Id.* Under these circumstances, the Tenth Circuit held that the backpackers should be sentenced on the basis of the total amount of marijuana that the group as a whole carried.[4]

Nevertheless, the fact that the defendants in *Ogbuehi* pleaded guilty to multiple conspiracy counts and the Defendants here did not does highlight the factual and evidentiary distinctions between this case and *Ogbuehi*, which bear on our determination whether the district court clearly erred in sentencing the Defendants.

4. In so holding, the Tenth Circuit noted that the defendants had entered into a plea agreement that included sentencing stipulations that the "defendants were entitled to three-level reductions for acceptance of responsibility, four-level reductions for having only a minimal role in the offense and two-level reductions under U.S.S.G. § 5C1.2's 'safety valve' provision." *Dominguez-Carmona*, 166 F.3d at 1055. As the court of appeals stated, sentencing the defendants according to the individual amounts of marijuana that they carried was "clearly inconsistent" with the terms of the plea agreement. *Id.* at 1058 n. 3. If the "[d]efendants were properly sentenced based on the amount of marijuana [they] individually carried, their offense levels would have been around 14 or 16," which would not be "high enough to warrant the safety-valve reduction to which the government stipulated in this case." *Id.*

Here, although the Defendants pleaded guilty, there was no plea agreement. Moreover, the district court specifically rejected the PSR's recommended base offense level of 26 and its suggestion to apply the "safety valve" reduction that would naturally follow a base offense level of 26 or higher. *See* U.S.S.G. § 2D1.1(b)(6). Thus, unlike the district court's sentencing decision in *Dominguez-Carmona*, the district court's decision here was internally consistent.

To the extent that the Tenth Circuit based its decision solely on the fact that the defen-

## III.

In sum, the "particular circumstances" in this case suggest that it falls squarely within the caveat of Commentary Example No. 8 that states: "the nature of the offense is more appropriately viewed ... as ... separate criminal activities." U.S.S.G. § 1B1.3(a)(1)(B) comment. n. 2(c)(8). There is therefore no basis for this court to conclude by "a definite and firm conviction" that the district court clearly erred in so finding. *See Asagba,* 77 F.3d at 325. Accordingly, we hold that the district court did not err in concluding that the defendants did not undertake "joint criminal activity" within the meaning of U.S.S.G. § 1B1.3(a)(1)(B) and the accompanying Commentary. Further, we affirm the decision of the district court to sentence the Defendants on the basis of the quantity of marijuana each personally carried, rather than on the total amount of marijuana recovered at the scene of their arrest.

■ AFFIRMED.

dants in *Dominguez–Carmona* pleaded guilty to crimes involving over 100 kilograms of marijuana and, therefore, their base offense levels were incorrectly set according to the amount of marijuana that they individually carried, we disagree. The Sentencing Guidelines do not mandate that pleading guilty to an offense inextricably binds the determination of the base offense level at sentencing. To the contrary, the Sentencing Guidelines state that a guilty plea alone, absent a plea agreement, has no required affect on the base

offense level of an offender. The Introductory Commentary to the Sentencing Guidelines section on plea agreements states unequivocally "that sentencing is a judicial function and that the appropriate sentence in a guilty plea case is to be determined by the judge." U.S.S.G. § 6B1.1 comment. Even where a plea agreement contains a nonbinding sentencing recommendation, the Sentencing Guidelines provide that "the court is not bound by the sentencing recommendation." U.S.S.G. § 6B1.1(b).