129 Nev., Advance Opinion 26

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| CHRISTOPHER ERIC CARTER,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 59392<br><br>**FILED**<br><br>APR 25 2013 |

Appeal under NRAP 4(c) from a judgment of conviction, pursuant to a jury verdict, of eight counts of burglary while in possession of a firearm, twelve counts of robbery with the use of a deadly weapon, and one count of coercion. Eighth Judicial District Court, Clark County; ~~Stefany Miley~~, Judge.

*Reversed and remanded.*

Karen A. Connolly, Las Vegas,
for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Ryan J. MacDonald, Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, SAITTA, J.:

In this appeal, we address whether a suspect who asks, "Can I get an attorney?" after he has been advised of his rights under *Miranda v.*

*Arizona*, 384 U.S. 436 (1966), unambiguously invokes his right to counsel, and if so, whether the State can resume the interrogation of the suspect by reading him a second set of *Miranda* warnings and obtaining an otherwise valid waiver.

We hold that the question "Can I get an attorney?" is an unequivocal request for the aid of counsel, triggering the requirement that all interrogation immediately cease. We also hold that once a suspect invokes his right to counsel, there may be no further interrogation unless the suspect reinitiates contact with the police, there is a sufficient break in custody, or the suspect is provided the aid of the counsel that he requested. For the reasons below, we conclude that appellant's confession was inadmissible, and because the error in admitting the confession is not harmless, we reverse the judgment of conviction and remand for further proceedings consistent with this opinion.[1]

## FACTS AND PROCEDURAL HISTORY

Appellant Christopher Carter's convictions stem from an investigation by the Las Vegas Metropolitan Police Department (LVMPD), in conjunction with the Federal Bureau of Investigation (FBI), into a series of robberies taking place between October 23, 2003, and February 2, 2005. Law enforcement suspected that the robberies were related due to the similar modus operandi and relatively small geographical area of the

---

[1]We deny respondent's motion to strike appellant's notice of supplemental authorities. We have considered all relevant authority provided by both parties.

crimes, but theorized that more than one man was responsible due to witnesses' varying descriptions of suspects' heights and weights and reports of waiting escape vehicles. Because the suspects' faces were obscured in each robbery, witnesses were unable to give any facial descriptions and were only able to identify them as African-American males. A lead was developed when a witness identified a black Mazda Miata as the escape vehicle for one of the robberies. FBI agents searched DMV records and came up with Carter as a possible suspect.

On February 3, 2005, FBI agents went to Carter's home and examined trash bags placed outside his fence. Inside the bags, they discovered a white T-shirt with apparent eyeholes cut out of it consistent with the description of a mask worn during one of the robberies. Based upon the T-shirt and Carter's identification found in the trash, LVMPD obtained a warrant. On February 19, 2005, SWAT teams entered Carter's home, handcuffed his brother and his mother, and placed him under arrest. Once at the police station, Carter proceeded to confess to multiple robberies, burglaries, and possession of a firearm. Ultimately, a jury found Carter guilty of eight counts of burglary while in possession of a firearm, twelve counts of robbery with the use of a deadly weapon, and one count of coercion.

Carter moved to suppress his confession prior to trial, claiming that interrogation began after he invoked his right to counsel. The district court conducted an evidentiary hearing.[2] At the evidentiary hearing, Detective Joel Martin testified that while escorting Carter to the police station after his arrest, he advised Carter of his rights under *Miranda*. Martin asked Carter "booking type" questions but nothing

[2] While Senior District Judge Sally Loehrer presided over Carter's trial and sentencing and entered the judgment of conviction in this matter, District Judge Donald M. Mosley heard and decided Carter's suppression motion.

3

substantively related to the offenses. According to Martin, during the drive, Carter expressed "concern" about hiring an attorney, and although Martin could not recall exactly what was said, he did not interpret it as a demand for an attorney. Martin admitted that Carter could have asked, "Can I get a lawyer?" or "Can I get an attorney?"

Carter testified that he asked Detective Martin, "Can I get a lawyer?" and Martin replied that they could talk about it later. Carter testified that he also could not remember exactly how he phrased his statement but submitted that he was requesting an attorney.

During argument, the State conceded that Carter asked either "Can I have a lawyer?," "May I have a lawyer?," or "Can I have my lawyer?," and framed the issue before the district court, stating: "This whole case, or this whole motion, comes down to one thing: Can I have an attorney? Is that question, is that an unequivocal request to I'm not speaking to you unless I have my attorney?" The district court found that Carter asked "Can I get an attorney?" and denied the motion to suppress his confession, concluding that (1) Carter's statement was ambiguous, and (2) there was no substantive questioning until after Carter was given a second set of *Miranda* warnings at the police station and waived his right to counsel.

## DISCUSSION

On appeal, Carter contends that the district court erred in denying the motion to suppress his confession, arguing that it was obtained in violation of *Miranda* and was therefore inadmissible as a matter of law. We review "the district court's factual finding concerning the words a defendant used to invoke the right to counsel" for clear error,

SUPREME COURT
OF
NEVADA

(O) 1947A

and "[w]hether those words actually invoked the right to counsel" de novo. *United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994); *Rosky v. State*, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005).

In *Miranda*, the Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against self-incrimination required that any interrogation of a suspect in custody "be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981) (citing *Miranda*, 384 U.S. at 479). In *Edwards*, the Court added a "'second layer'" of protection. *Davis v. United States*, 512 U.S. 452, 458 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)). Under the *Edwards* rule, once a suspect invokes the right to counsel under *Miranda*, he cannot be subject to further interrogation and all questioning must cease until counsel has been made available to him. *Edwards*, 451 U.S. at 484-85.

To determine whether, under *Edwards*, all interrogation must cease, a court must first "determine whether the accused actually invoked his right to counsel." *Davis*, 512 U.S. at 458 (emphasis and internal quotation marks omitted). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Id.* at 459 (quoting *McNeil*, 501 U.S. at 178). However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* "Second,

SUPREME COURT
OF
NEVADA

5

(O) 1947A

if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (internal citations and quotation marks omitted).

*Whether Carter invoked his right to counsel*

Following *Edwards*, we must first determine whether Carter's statement "Can I get an attorney?" is an unequivocal demand for counsel, requiring that all questioning immediately cease until counsel is present, or is merely an ambiguous inquiry into the extent of his rights. Having compared Carter's reference to counsel to that in *Davis*, *Smith*, and other cases, as well as the context in which those words were spoken, we have no difficulty in concluding that Carter's statement was an unambiguous and unequivocal request for the assistance of counsel during questioning. While "[t]he word attorney has no talismanic qualities" and "[a] defendant does not invoke his right to counsel any time the word falls from his lips," *Kaczmarek v. State*, 120 Nev. 314, 330, 91 P.3d 16, 27 (2004) (internal quotation marks omitted), there are no circumstances here that would suggest to a reasonable officer anything other than that Carter was asking for the aid of an attorney. It is implausible that Carter was simply asking if he had the theoretical right to an attorney considering that detectives had just told him that he had such a right. There were no other words modifying the statement that suggest Carter was attempting to clarify the extent of his rights or make a temporal inquiry. *See, e.g., Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) (appellant's question, "Can I get an attorney *right now, man?*" was held to be unambiguous in context

(emphasis added)); *People v. Harris*, 552 P.2d 10, 11-13 (Colo. 1976) (appellant's question, "*When* can I get a lawyer?" was held to be unambiguous (emphasis added)). Carter did not use words like "might," "maybe," "perhaps," or "should" or in any way suggest he was unsure of whether he wanted an attorney. *See Smith v. Endell*, 860 F.2d 1528, 1531 (9th Cir. 1988). To hold that a suspect who asks "Can I get an attorney?" does not invoke his right to counsel would suggest that no statement phrased as a question could invoke one's right to counsel—a holding contrary to law and lacking a fundamental understanding of the nature of human interaction. *See, e.g., Davis*, 512 U.S. at 461 (noting that under *Miranda* and its progeny "questioning must cease if the suspect *asks* for a lawyer" (emphasis added)); *id.* at 470 n.4 (Souter, J., concurring) ("Social science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant."). We conclude that it is clear, not only by the words used but also given the circumstances in which they were spoken, that Carter expressed his desire for the assistance of an attorney, and a reasonable officer would have understood it as such.

The fact that shortly thereafter Carter communicated that he was merely "concerned" about an attorney does nothing to alter our decision. The Supreme Court has strongly repudiated consideration of a suspect's subsequent statements in order to cast doubt on the clarity of an initial request. *Smith*, 469 U.S. at 100 (1984) ("We hold only that, under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective

Supreme Court
of
Nevada

(O) 1947A

7

doubt on the clarity of the initial request itself."). Once a suspect requests an attorney, *Miranda* and its progeny do not allow police officers to subtly interrogate the suspect under the guise of clarifying intentions that are already clear. "In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id.* at 98 (alteration in original) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983)). Here, Carter expressed in no uncertain terms that he would like the assistance of an attorney in dealing with the police. His words were unequivocal and unambiguous and his request should have been honored.

*Whether Carter's waiver was valid*

We must next determine whether Carter validly waived his right to counsel. *Id.* at 95. *Edwards* makes abundantly clear that once counsel is requested all questioning must immediately cease, and that the right may only be waived if the accused initiates subsequent communication, there is a break in custody, or he receives the counsel that he asked for—none of which occurred here. *See Kaczmarek*, 120 Nev. at 328-29, 91 P.3d at 26. That nothing substantive was asked until after a second set of *Miranda* warnings were given and Carter waived his rights is of no consequence because his prior request for an attorney precluded any further interrogation under the circumstances presented. Simply put, once an accused expresses his desire to confer with counsel, there are no actions that police officers can take to revive questioning other than honoring that request. Because Carter's confession was an uncounseled

SUPREME COURT
OF
NEVADA

(O) 1947A

8

response to questioning that occurred after he invoked his right to counsel, it must be suppressed regardless of whether his subsequent waiver was otherwise valid. *Id.* at 329, 91 P.3d at 26 ("If police later initiate an encounter in the absence of counsel and there has been no break in custody, 'the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.'" (quoting *McNeil*, 501 U.S. at 177)).

Because Carter's confession was the linchpin in the case against him, we cannot say that its admission was harmless. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (noting that "'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt'" (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993))). Absent his confession, the entirety of the evidence against Carter is his ownership of a vehicle consistent with one seen leaving the scene of a robbery, his ownership of a firearm consistent with one used during the robberies, and the discovery in bags set out for garbage pickup of a white T-shirt with apparent eyeholes cut out of it consistent with a facial covering used by the suspect at two robberies. No other physical or testimonial evidence placed Carter at any of the robberies.[3] Under the circumstances, we

---

[3]Because we reverse Carter's convictions, we need not address his claims that the district court erred by denying his motion to suppress

*continued on next page . . .*

cannot say beyond a reasonable doubt that the erroneous admission of Carter's confession did not contribute to his conviction, and therefore we are compelled to reverse the judgment of conviction and remand to the district court for proceedings consistent with this opinion.

_____, J.
Saitta

We concur:

_____, C.J.
Pickering

_____, J.          _____, J.
Gibbons                               Hardesty

_____, J.          _____, J.
Parraguirre                           Douglas

_____, J.
Cherry

_____

. . . continued

physical evidence seized by the police and that he was denied his constitutional right to a fair and impartial jury.