294 F.3d 1094
 In re Marciano ELLIS.
Marciano Ellis, Petitioner,
v.
United States District Court for the Western District of Washington (Tacoma); Respondent,
United States of America, Real Party in Interest.
 No. 01-70724.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 17, 2001.
 Filed June 21, 2002.
 
 Miriam F. Schwartz, Assistant Public Defender, Tacoma, WA, for the petitioner.
 Robert Westinghouse, Assistant United States Attorney, Seattle, WA, for the real party in interest.
 Jack E. Tanner (briefed), Senior United States District Judge, Tacoma, WA, for the respondent.
 David Eugene Wilson (argued), Seattle, WA, for the respondent.
 Appeal from the United States District Court for the Western District of Washington, Jack E. Tanner, District Judge, Presiding.
 Before FARRIS, KLEINFELD, and GOULD, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge.
 
 
 1
 This case involves the extent of a district court's discretion to reject a charge bargain in a proposed plea agreement.
 
 Facts
 
 2
 Marciano Carlos Ellis was indicted for first degree murder.[1] According to the statement of facts in his signed plea agreement, he called a taxicab on Friday, March 5, 1999 from a payphone in front of a doughnut shop. Donald Ray Barker, a 46 year old cabdriver, picked him up a few minutes later, a little after 8:00 p.m. Some time between then and 8:20, when Mr. Barker's dead body was found in the cab, Ellis shot him three times in the back of the head.
 
 
 3
 Ellis killed Barker on Fort Lewis, a military reservation, so there was federal jurisdiction, and, though sixteen years old when he murdered Barker, Ellis was transferred to adult prosecution.[2] Ellis and the U.S. Attorney's office negotiated a plea agreement providing that Ellis would plead guilty to second degree murder (he was indicted for first degree murder), and "if the Court decides on a sentence other than 132 months, either party may withdraw from the Plea Agreement." In the agreement, Ellis acknowledged that the government had agreed "not to prosecute all the criminal charges which the evidence establishes were committed by the defendant" in exchange for his agreement.
 
 
 4
 At the change of plea proceeding on December 8, 2000, the district judge put Ellis under oath and carefully took him through the examination required by Federal Rule of Criminal Procedure 11. Ellis pleaded guilty to second degree murder as charged by the information, waiving all the rights of which the judge advised him. He was advised that the statutory maximum was life imprisonment and the guideline range was 121 to 151 months. As the judge was advising the defendant about the court's power to depart from the guidelines, his lawyer stated that this was a Rule 11(e)(1)(C) agreement for a specific sentence, and the judge responded "Well, I haven't accepted anything yet."
 
 
 5
 At the end of the colloquy, Ellis pleaded guilty, and the judge made findings:
 
 
 6
 THE COURT: Mr. Ellis, what is your plea, guilty or not guilty?
 
 
 7
 THE DEFENDANT: I plead guilty, Your Honor.
 
 
 8
 THE COURT: Okay. I find that you knowingly and intelligently waived your rights to have this matter presented to a Grand Jury. And you know your rights to a jury trial. And you know your rights to appeal. You know the maximum possible punishment.... there's possible fines or a period of supervised release.... [maximum five years and $175,000] ... [and a mandatory penalty assessment of $100].
 
 
 9
 The court ordered a preparation of a presentence report and set a date for sentencing.
 
 
 10
 The presentence report disclosed that Ellis had three prior adjudications, the most serious of which was for residential burglary. He also had seven other charges or arrests, some apparently quite serious, that had not been pursued to adjudication and therefore could not be considered.
 
 
 11
 The presentence report also laid out facts showing that the FBI had developed a very solid case against Ellis. A witness had seen a person fitting Ellis's description, and wearing a coat he commonly wore up until but not after the murder, get into the cab on the night of the murder. After a flyer had been posted about the murder of the cabdriver, a second witness called the FBI and said that "a high school friend of [Ellis] had boasted about killing a cab driver on Ft. Lewis," and that Ellis had asked this friend to "help him plan the robbery and killing of a cab driver." After the murder, Ellis showed this witness a "taxi license card on a chain" and told him it had belonged to the driver he had killed.
 
 
 12
 FBI agents placed an electronic wire on this witness, and got Ellis on the wire saying "Yeah, that was me," in response to the friend asking about the murder of the cabdriver. Also on the wire, Ellis said he'd gotten into the back seat, they'd gone to Northgate Road, he shot the driver there, and he took $2,300 which he used to buy drugs.
 
 
 13
 The FBI got a search warrant and found in Ellis's residence a receipt for the gun that ballistic tests showed was the gun used in the murder. They also found a brass shell casing matching the ballistics of the bullets in the cabdriver's skull. Ellis had had his girlfriend act as a strawman to buy the gun for him, when she turned 21, because he was too young to buy a gun. The girlfriend, a third potential witness, kept a newspaper clipping about Ellis being held for the cabdriver's murder in her wallet. A fourth witness testified before the grand jury that he and Ellis used to sell methamphetamine together, and that Ellis had told him he had shot the cabdriver. Following the lead of this fourth witness, the gun was traced to "a gang member who is well known to law enforcement." The gang member, a potential fifth witness, sold the FBI the gun for $1,000, enabling them to tie the gun to the shell casing found at Ellis's residence and the paperwork from his girlfriend's purchase of it.
 
 
 14
 In its Sentencing Recommendation, the United States Probation Office urged a sentence of 151 months, for a term of imprisonment "at the top of the sentencing guideline range" (though not the statutory maximum) for second degree murder. The probation officer acknowledged that that would exceed the amount agreed to in the 11(e)(1)(C) plea bargain, and that imposition of such a sentence would "allow[] [the defendant] the opportunity to withdraw from the Plea Agreement." But he said he could not "recommend a sentence which is less than the maximum allowed under the guidelines for an offense such as the one before the Court."
 
 
 15
 Prior to the sentencing hearing, the government filed a memorandum urging acceptance of the plea bargain. The AUSA argued that the cabdriver, Mr. Barker, was an "unfortunate soul who was in the wrong place at the wrong time," but that "there is much about the defendant that also is fairly 8939 characterized as most unfortunate," in that he was sixteen-and-a-half at the time he murdered the cabdriver (eighteen by the time of the criminal proceeding), he lived in an unstructured environment, he had had no contact with his father for many years, and he received virtually no supervision from his mother. Also listed as "unfortunate" were the government's observations that Ellis and "his associates" didn't attend school regularly, if at all, and "[t]heir days were indistinguishable, one from the next, and consisted primarily of sleeping, eating junk food, hanging out in one apartment or another, playing video games, using alcohol and drugs, [and] engaging in sexual activities." The government urged acceptance of the plea bargain because of Ellis's youth, unfortunate circumstances, lack of eyewitnesses to the shooting itself, lack of evidence of planning on the day of the shooting (although Ellis had, prior to that day, stated his intention to murder a cabdriver), and varied explanations of why he had done it (he panicked because he thought the cabdriver had locked his door, the cabdriver had laughed at him). Also, Ellis had written a letter to the judge saying "from the bottom of my heart I want to apologize to Mr. Barker's family" and "all I can try to do is get on the straight and narrow."
 
 
 16
 At the outset of the sentencing hearing on April 17, 2001, the district judge said "I think I should tell you now, I'm not going to accept it. I've read the government's sentencing memorandum and the probation's recommendation. I can't accept it." He nevertheless heard argument. Both the AUSA and defense counsel argued strenuously for acceptance of the plea agreement, but the court decided to adhere to its rejection:
 
 
 17
 I have read the government's Sentencing Memorandum, together with the Defendant's Sentencing Memorandum, and I have listened to the government and the Defendant. I must tell you, justice in my opinion hasn't been done in this case, the way it stands now. I think the matter should go to a jury. I think the matter should go to a jury, period. So the ball is back in the government's court.
 
 
 18
 The court then set trial on the pending indictment for first degree murder.
 
 
 19
 Defense counsel then filed what it styled a "Motion for Compliance with Fed.R.Crim.P. 11(e)(4)." Rule 11(e)(4) entitles the defendant in appropriate circumstances to withdraw a plea if the court rejects a plea agreement. On its face, this would be confusing, because the court had already, at the April 17 sentencing hearing, treated the plea of guilty to second degree murder as withdrawn or stricken, and had taken a plea of not guilty to first degree murder. The thrust of the motion, though, was the opposite, not that the defendant should be allowed to withdraw his plea, but that "the guilty plea stands and he must be sentenced on the charge of second degree murder." The government filed a memorandum agreeing with the defendant. The court held a hearing on this motion. The government led off, in support of the defense motion, arguing that "it is a somewhat perplexing matter as to what this phenomenon of accepting a plea is all about." But, the AUSA argued, the defense was correct that the court was bound by Ellis's plea to second degree murder, and to reject his plea was to interfere with the executive branch prerogative to decide how to prosecute. Defense counsel followed up with an argument that the court had accepted the plea to second degree murder and was bound by its acceptance. The court treated the matter as a motion to reconsider its earlier decision to reject the plea agreement, denied it, and kept the trial date as previously set.
 
 
 20
 Ellis then filed a petition for a writ of mandamus. The petition requests that we direct the district court to vacate its orders rejecting the plea agreement and setting the case for trial, direct assignment of the case to a different district judge, and hold that Ellis was entitled to be sentenced for second degree murder in accord with his plea agreement. The government filed a response agreeing with the defense,[3] except that the government did not join in the request that the case be assigned to a different district judge on remand. This petition for a writ of mandamus is what is before us now. A response to this largely joint position was filed by the United States District Court.
 
 Argument
 
 21
 Mandamus issues "only in extraordinary situations" and where there are "exceptional circumstances amounting to a judicial usurpation of power."[4] We generally apply the factors set out in Bauman v. United States District Court:[5]
 
 
 22
 (1) the district court's order raises new and important problems, or issues of law of first impression; (2) the district court's order is clearly erroneous as a matter of law; (3) the party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires; and (4) the petitioner will be damaged or prejudiced in a way not correctable on appeal.[6]
 
 
 23
 In this case, petitioners' argument for mandamus rests on the second ground, and no other ground is applicable. But the district court was correct as a matter of law, so mandamus is inappropriate.
 
 
 24
 Petitioners' first argument is that the district court accepted Ellis's plea to second degree murder, and is stuck with it. Their theory is that under United States v. Hyde,[7] acceptance of a plea and acceptance of a plea agreement are two different things, so it follows that once the judge accepted the plea, the court was bound by that regardless of whether it accepted the plea agreement. Petitioners' premise is right, their conclusion wrong.
 
 
 25
 The district court did indeed accept the plea at the December 8 proceeding, in the portion quoted above where the court said "Okay. I find that you knowingly and intelligently waived your rights to have this matter presented to a Grand Jury. And you know your rights...." This meant that so far as the court could determine, the plea was voluntary, the defendant was competent to enter it, the defendant had been properly advised of the consequences and understood them, the defendant knowingly and intentionally waived his rights to jury trial, confrontation, and so forth, as required by the procedure for accepting pleas set out in Federal Rule of Criminal Procedure 11.[8] And Hyde, as petitioners contend, does indeed distinguish between acceptance of the plea and acceptance of the plea bargain.[9] Though the court did not accept the plea bargain or speak to it expressly, it did accept the defendant's plea.
 
 
 26
 But petitioners' implication, that the plea must stand despite subsequent judicial rejection of the plea bargain, does not follow, from Hyde or anything else. The point of Hyde was to correct an error our court had made on a different issue. We had held that even after the court accepts a guilty plea, so long as it hasn't yet accepted the plea bargain, the defendant can withdraw the plea for any reason rather than a "fair and just reason" as provided by Federal Rule of Criminal Procedure 32(e).[10] Our rationale was that the plea and plea agreement are "inextricably bound up together," so the plea isn't accepted until the plea bargain is.[11] The Supreme Court reversed, because "[g]uilty pleas can be accepted while plea agreements are deferred, and the acceptance of the two can be separated in time."[12]
 
 
 27
 That acceptance of the plea may precede acceptance of the plea bargain, however, does not imply that acceptance of the plea (including dismissal of charges where the plea is to a lesser offense) is final and binding on the court, even if the plea bargain is rejected. Rule 11(e)(4) provides that when the court "rejects the plea agreement" on which a plea is predicated, the court must "afford the defendant the opportunity to then withdraw the plea."[13] This rule implies the conditionality of acceptance of the plea on acceptance of the agreement.[14] And Rule 11(e)(6) protects the defendant from use against him of what he admitted when he pleaded guilty, if the plea is withdrawn.[15] This conditionality is a two way street. If the plea bargain is rejected, the defendant can withdraw his plea, or the court can vacate it.[16] Where the plea bargain involves a plea to a lesser charge and dismissal of the charge in the indictment, there is no way to reject the agreement without vacating the plea.
 
 
 28
 We so held in United States v. Cordova-Perez.[17] There the judge accepted a plea to a lesser offense, as here, without saying it was conditional.[18] After reading the presentence report, the judge in Cordova-Perez did just what the judge in the case at bar did: he decided that the plea bargain did not reflect the seriousness of the conduct, rejected the plea agreement, vacated the guilty plea to the lesser offense, reinstated the original indictment, and set the case for trial.[19] Cordova-Perez reasons that because the court must defer its decision on whether to accept the plea agreement to dismiss charges or for a plea to a lesser charge until the presentence report is filed, acceptance of the plea prior to that is necessarily conditional.[20] The reasoning in Cordova-Perez is compelled by the Rules and Guidelines. No other conclusion can be squared with the Rules and Guidelines. Cordova-Perez is still good law, and controlling.
 
 
 29
 Petitioners argue that because Hyde rejected our use of the proposition that "the plea agreement and the plea are inextricably bound up together" for purposes of letting a defendant withdraw a plea without a "fair and just reason" (and we used that proposition in Cordova-Perez), it rejected by implication the connection between the plea and plea bargain where the court vacates the plea. That reading of Hyde is incorrect for several reasons.
 
 
 30
 First, Hyde spoke to a different issue, attempts by defendants to withdraw pleas without a "fair and just reason," such as when events make clear that a sentence will be harsher than they had expected.[21] Second, the Rules and Guidelines don't allow for petitioners' reading. This, not the "inextricably bound up together" principle, was the crux of the analysis in Cordova-Perez, as discussed above. Under Rule 32(b), a pre-sentence report is required unless the court makes findings justifying its absence.[22] Except in a limited category of cases where a finding is made that a presentence report is unnecessary, the Guidelines require a district court to "defer its decision" to accept a plea bargain "until there has been an opportunity to consider the presentence report."[23] Rule 11 is integrated with the Guideline by subsection 11(e)(2), which provides that where the court does not accept the plea agreement (not just the plea) at the Rule 11 proceeding, it may "defer its decision" as to acceptance of the plea agreement "until there has been an opportunity to consider the pre-sentence report."[24] That's why Cordova Perez construed the district court's acceptance of the plea in that similar case to be conditional on the court's subsequent acceptance of the plea agreement, even though the district court did not say it was conditional.[25] There might have been some doubt about reading an acceptance of a plea as conditional when the judge didn't say so before the Guidelines,[26] but there's no doubt since, because Guideline 6B1.1(c) generally does not permit a judge to accept a plea and plea bargain unconditionally prior to the presentence report.
 
 
 31
 Third, Hyde provides expressly for this analysis, treating acceptance of the plea agreement as a "condition subsequent" to the acceptance of the plea.[27] Hyde notes that under the Sentencing Guidelines, for charge bargains and agreements to particular sentences, such as Ellis made in the case at bar, "a district court is required to defer its decision about whether to accept a type A or type C agreement until after it has reviewed the presentence report."[28] The procedure the Supreme Court lays down in Hyde is the one used by the district court in the case at bar: the defendant performs his side of the plea bargain, by pleading guilty, then the court gets a presentence report and decides whether to accept the plea agreement including the government's side of the bargain, and if the court rejects it, then the plea agreement is "terminated" "just as a binding contractual duty may be extinguished by the nonoccurrence of a condition subsequent":
 
 
 32
 [T]he Rules nowhere state that the guilty plea and the plea agreement must be treated identically. Instead, they explicitly envision a situation in which the defendant performs his side of the bargain (the guilty plea) before the Government is required to perform its side (here, the motion to dismiss four counts). If the court accepts the agreement and thus the Government's promised performance, then the contemplated agreement is complete and the defendant gets the benefit of his bargain. But if the court rejects the Government's promised performance, then the agreement is terminated and the defendant has the right to back out of his promised performance (the guilty plea), just as a binding contractual duty may be extinguished by the nonoccurrence of a condition subsequent.[29]
 
 
 33
 The procedure urged on us by petitioners in the case at bar would conflict with this. Merely allowing the defendant at his election to back out of his plea won't effectuate the termination of the plea agreement where the defendant has pleaded to a lesser offense, unless the government can proceed on the original indictment. Vacating the plea is appropriate and consistent with Hyde. Ellis's plea was accepted subject to a condition subsequent, judicial approval of the plea agreement.
 
 
 34
 Petitioners present another argument, that the district judge improperly encroached on the executive branch's prerogative to decide how to prosecute crimes and when to dismiss charges. Their citations are to cases under Federal Rule of Criminal Procedure 48(a), establishing that a district court's discretion to deny a government motion to dismiss is limited.[30] The executive branch does indeed have a broad charging prerogative, but sentencing is emphatically a judicial prerogative.[31] Where a plea agreement "includes the dismissal of any charges" the court may accept the agreement only if it makes a determination for reasons stated on the record "that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines."[32] We observed in United States v. Fine[33] that:
 
 
 35
 [t]he purpose of the 6B1.2(a) plea bargaining standard is to avoid inappropriate lenience. Congress wanted sentencing judges to review charge-reduction plea agreements to ensure that such agreements do not result in undue leniency or unwarranted sentencing disparities.... The guidance was to assure that judges can examine plea agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines.[34]
 
 
 36
 We concluded in Fine that "[p]lea bargaining is not a private contractual arrangement unaffected by the public interest. The public interest does not favor fictional minimalization of crimes actually committed for purposes of sentencing. Under the guidelines, a strong judicial hand is necessary to protect the public interest."[35] The district court believed the sentence in the case at bar resulted in undue leniency, so it was prohibited from accepting the plea agreement that included dismissal of the first degree murder charge.
 
 
 37
 As for how to reconcile this proposition with the proposition that a district court has but limited discretion to deny a government motion to dismiss charges, the tension is illusory. The government, if it wishes to invoke its prerogative under Rule 48(a), has but to make a motion to dismiss under Rule 48(a).[36] It never did so in the case at bar. There is a good reason why not. The usual procedure for dismissal of charges following a plea bargain is that the government makes the motion to dismiss at the end of the sentencing proceedings, after all the other parts of the plea agreement have been performed. There was nothing to stop the government from filing a Rule 48(a) motion in the case at bar, if it was prepared to accept the responsibility for dismissing the first degree murder charges regardless of whether the defendant pleaded to second degree and the court accepted the plea agreement.[37] It didn't file such a motion. Instead of moving to dismiss the charges, taking responsibility for that, and taking its chances on a second degree murder conviction, the government sought to hold the court to a plea agreement that the court deemed inadequate to reflect the seriousness of the crime. That it cannot do.
 
 
 38
 Ellis (but not the government) argues that remand to a different judge is necessary in order to have his plea agreement fairly considered and to avoid bias.[38] The record shows neither error nor bias, just proper and laudable independent examination of the presentence agreement prior to accepting a plea agreement.
 
 
 39
 The petition for a writ of mandamus is DENIED.
 
 
 
 Notes:
 
 
 [1]
 18 U.S.C. §§ 1111 (a) & (b), 7(3)
 
 
 [2]
 18 U.S.C. § 5032
 
 
 [3]
 Because the defendant and the government agree as to most of their arguments, we refer to them jointly as "petitioners" except where otherwise noted
 
 
 [4]
 See Bauman v. United States District Court, 557 F.2d 650, 654 (9th Cir.1977) (quoting Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)); see also Valenzuela-Gonzalez v. United States District Court, 915 F.2d 1276, 1278-79 (9th Cir.1990).
 
 
 [5]
 557 F.2d 650 (9th Cir.1977)
 
 
 [6]
 Id. at 654-55.
 
 
 [7]
 520 U.S. 670, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997)
 
 
 [8]
 Fed.R.Crim.P. 11(c), (d), (f)
 
 
 [9]
 Hyde, 520 U.S. at 674, 117 S.Ct. 1630.
 
 
 [10]
 See United States v. Hyde, 92 F.3d 779, 781 (9th Cir.1996) ("Hyde I") (overruled in United States v. Hyde, 520 U.S. 670, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997) ("Hyde II")).
 
 
 [11]
 Hyde I, 92 F.3d at 780.
 
 
 [12]
 Hyde II, 520 U.S. at 674, 117 S.Ct. 1630.
 
 
 [13]
 Fed.R.Crim.P. 11(e)(4) ("If the court rejects the plea agreement, the court shall, on the record, inform the parties of this fact, advise the defendant personally in open court or, on a showing of good cause, in camera, that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw the plea, and advise the defendant that if the defendant persists in a guilty plea or plea of nolo contendere the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.");see also Hyde II, 520 U.S. at 676, 117 S.Ct. 1630 (rejecting view that defendant can withdraw a plea anytime before sentencing).
 
 
 [14]
 See, e.g., United States v. Grant, 117 F.3d 788, 791 (5th Cir.1997).
 
 
 [15]
 Fed.R.Crim.P. 11(e)(6)
 
 
 [16]
 See, e.g., United States v. Cordova-Perez, 65 F.3d 1552, 1555-556 (9th Cir.1995).
 
 
 [17]
 65 F.3d 1552 (9th Cir.1995)
 
 
 [18]
 Id. at 1555.
 
 
 [19]
 Id. at 1554.
 
 
 [20]
 Id. at 1556; accord United States v. Foy, 28 F.3d 464, 471 (5th Cir.1994), cert. denied, 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994) (holding that under U.S.S.G. § 6B1.1(c), acceptance of a guilty plea is contingent upon the court's review of the presentence report, but acknowledging that "the better practice would certainly be for the district court to expressly point out at the Rule 11 hearing that although the plea met all the requirements for acceptance ... and was provisionally accepted, final acceptance was contingent on the court's review of the PSR.").
 
 
 [21]
 Hyde II, 520 U.S. at 672-73, 117 S.Ct. 1630.
 
 
 [22]
 Fed.R.Crim.P. 32(b)(1) ("The probation officer must make a presentence investigation and submit a report to the court before the sentence is imposed, unless: (A) the court finds that the information in the record enables it to exercise its sentencing authority meaningfully under 18 U.S.C. § 3553; and (B) the court explains this finding on the record.")
 
 
 [23]
 U.S. Sentencing Guidelines Manual § 6B1.1(c) (2000) ("The courtshall defer its decision to accept or reject any nonbinding recommendation pursuant to Rule 11(e)(1)(B), and the court's decision to accept or reject any plea agreement pursuant to Rules 11(e)(1)(A) and 11(e)(1)(C) until there has been an opportunity to consider the presentence report, unless a report is not required under § 6A1.1.") (emphasis added).
 
 
 [24]
 Fed.R.Crim.P. 11(e)(2) ("If a plea agreement has been reached by the parties, the court shall, on the record, require the disclosure of the agreement in open court ... at the time the plea is offered. If the agreement is of the type specified in subdivision (e)(1)(A) or (C), the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the pre-sentence report.")
 
 
 [25]
 Cordova-Perez, 65 F.3d at 1555-56.
 
 
 [26]
 See United States v. Partida-Parra, 859 F.2d 629 (9th Cir.1988).
 
 
 [27]
 Hyde II, 520 U.S. at 679, 117 S.Ct. 1630.
 
 
 [28]
 Id. at 675 n. 2, 117 S.Ct. 1630. (emphasis in original).
 
 
 [29]
 Id. at 677-78, 117 S.Ct. 1630.
 
 
 [30]
 See United States v. Garcia-Valenzuela, 232 F.3d 1003 (9th Cir.2000); United States v. Gonzalez, 58 F.3d 459 (9th Cir.1995); United States v. Miller, 722 F.2d 562 (9th Cir.1983).
 
 
 [31]
 See, e.g. United States v. Palafox-Mazon, 198 F.3d 1182, 1190 (9th Cir.2000).
 
 
 [32]
 U.S. Sentencing Guidelines Manual § 6B1.2(a) (2000) ("In the case of a plea agreement that includes the dismissal of any charges or an agreement not to pursue potential charges ... the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.")
 
 
 [33]
 975 F.2d 596 (9th Cir.1992)
 
 
 [34]
 Id. at 601 (internal quotations omitted).
 
 
 [35]
 Id. at 604 (internal quotations omitted).
 
 
 [36]
 Fed.R.Crim.P. 48(a) ("The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.")
 
 
 [37]
 Accord United States v. Escobar Noble, 653 F.2d 34, 37 (1st Cir.1981) ("Plea bargains ... go to the traditionally judicial function of determining what penalty to impose. The prosecutor here was unwilling to withdraw the charge, and to accept such responsibility as would have accompanied such action.").
 
 
 [38]
 See United Nat'l Ins. Co. v. R & D Latex Corp., 242 F.3d 1102, 1118-119 (9th Cir. 2001).