In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00188-CR
_____

**SHERRIE HOFF, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 13-01-00945 CR**

**MEMORANDUM OPINION**

In five issues, Sherrie Hoff (Hoff or Appellant) challenges her conviction for driving while intoxicated, third or more, and punishment of fifteen years' confinement. We affirm the trial court's judgment.

FACTUAL BACKGROUND

A grand jury indicted Hoff for driving while intoxicated, third or more. *See* Tex. Penal Code Ann. §§ 49.04, 49.09(b) (West Supp. 2016). The indictment also alleged that Hoff used a deadly weapon, namely, a motor vehicle, during the

1

commission of the offense. Additionally, the indictment included enhancements for two previous felony convictions. Hoff pleaded "[n]ot guilty[.]" Hoff stipulated that she was previously convicted of driving while intoxicated in 1991 and in 2011.

Testimony of Eyewitnesses

Sudie Beard (Sudie) testified that on the day in question, she and her husband (collectively the Beards) were traveling in their vehicle on road 1485 in Montgomery County, Texas, with her husband driving. According to Sudie, the Beards were traveling in the left-hand lane of 1485, approaching the intersection of Kidd Cemetery Road, heading west, when another vehicle came up behind them in the right-hand lane. Sudie explained that when vehicles approach the intersection of 1485 and Kidd Cemetery Road, vehicles in the right lane are required to make a right turn. Sudie testified that the vehicle that approached them was a van, the van then passed the Beards' vehicle going a little faster than the Beards, and the van "kind of hit an orange barrel[.]" Sudie explained that the Beards' vehicle continued on 1485 westbound. Sudie saw the van in front of the Beards' vehicle, and the driver of the van was driving erratically, then hit a guardrail and ricocheted off the guardrail and proceeded "off across the little bridge and . . . through the ditch and hit a tree." According to Sudie, the Beards then pulled off onto the shoulder and Sudie called 911, but a deputy arrived at the scene before the 911 operator

2

answered. Sudie testified that the driver of the van got out of the van and, although the driver seemed to be okay, the driver appeared "dazed" or "unaware[,]" and her voice sounded "puzzled."

At trial, Sudie identified Hoff as the person who was driving the van that day. Sudie also testified that she did not see anyone in the van other than Hoff, and she did not smell alcohol on Hoff. Sudie reported that the weather that day was clear and she agreed that the traffic on the road was "moderate[.]"

Roland Beard (Roland) also testified. According to Roland, he and his wife Sudie were driving on 1485 on the day of the accident. Roland explained that a van was originally driving behind the Beards, but the van "whipped over into my -- our lane ahead of us[]" where the lane in which the van was traveling became a right-turn-only lane. Roland described the van's lane change as "abrupt[]" and explained that the van "[c]lipped one of those barricade barrels[]" in the process. Roland testified that, after the van moved into his lane, he "slowed down a little more[]" and explained that "I've seen from my previous experience driving like that, you don't get too close."

Roland further explained as follows:

[State's attorney]: So, did you -- when she whipped into the lane that you were in, did you have to put on your brakes or take any maneuvers to avoid it?

3

[Roland]: I slowed down a little more.

[State's attorney]: What did -- what did the van do after that?

[Roland]: Continued traveling westbound on 1485.

[State's attorney]: And did you notice anything else -- any other odd driving on the way?

[Roland]: Kept easing into the right, like there was a magnet pulling it.

[State's attorney]: Okay. And did she hit anything else?

[Roland]: There was a guardrail over a small -- it was right across the highway. Hit that and then went onto further down the road.

[State's attorney]: You said she clipped that and then went further down the road?

[Roland]: Yes.

[State's attorney]: And what happened after she got pas[t] the guardrail?

[Roland]: Again, just kept easing over to the right.

[State's attorney]: What happened, ultimately, after she continued easing over to the right?

[Roland]: The right -- like construction barrel. It pulled her into the ditch, and she struck a small tree . . . .

. . . .

[State's attorney]: So, after -- you said after she crashed, what did you see next?

4

[Roland]: I think I saw the air bag go off.

[State's attorney]: Okay. Which air bag?

[Roland]: In her car.

[State's attorney]: In which seat in the car?

[Roland]: Driver's side.

Roland testified that, after the van crashed, the driver walked over to the Beards' vehicle, but Roland did not talk with the driver of the van. Roland also testified that he gave a statement to a DPS Trooper on the day of the accident. Roland also described what the traffic was like on the day in question, stating as follows:

[State's attorney]: Okay. Do you recall what the traffic was like on 1485 that day?

[Roland]: It was called average.

[State's attorney]: Average?

[Roland]: Yeah.

[State's attorney]: Okay. Tell me a little bit about what average traffic on 1485 looks like?

[Roland]: Anything from the posted speed limit to ten over.

[State's attorney]: Okay. So, people maybe go a little fast?

[Roland]: A little fast, yes.

[State's attorney]: How many cars would you say were on the road that day?

5

[Roland]: Oh, lord. I haven't -- I wasn't taking a traffic consensus [sic], so I don't know.

[State's attorney]: Okay. Would you categorically say it was a few, moderate or a lot?

[Roland]: Probably moderate.

. . . .

[Defense attorney]: Okay. Would you say the traffic was average on that video?

[Roland]: Probably so.

[Defense attorney]: So, that's the way it is normally during the day about that time?

[Roland]: It's really, really active.

Testimony of Deputy O'Connor

Deputy O'Connor (O'Connor) with the Montgomery County sheriff's office testified that he was on duty and patrolling on the day of the accident. He explained that as he was driving on 1485, he encountered a "[v]ehicle off the side of the road that was partially in the woods[]" and he radioed it in as an "unknown major minor[]" accident. O'Connor recalled the driver telling him she was not injured, but O'Connor still called for EMS. At trial, O'Connor identified Hoff as the driver of the van.

6

O'Connor testified that, when he asked Hoff for her driver's license, she handed him a prescription bottle that was inside the van. O'Connor explained that Hoff also handed him a bag from a pharmacy containing other pill bottles. According to O'Connor, Hoff appeared "very relaxed for someone that had just had an accident[]" and her speech was slowed. O'Connor testified that he had taken classes relating to DWI investigations and field sobriety tests, and that in his training, he had learned what to look for in detecting whether drivers are intoxicated. O'Connor explained that his suspicions that Hoff was driving while intoxicated were based on her giving him the pill bottle instead of her driver's license, the conversation he had with her in which she told him she had gone to the pharmacy, and that Hoff told him she had taken Soma medication about twenty minutes earlier. Once a DPS Trooper arrived at the scene, O'Connor relayed his impressions and passed the investigation to the Trooper.

Testimony of Trooper Larson

Trooper Larson (Larson) with the Texas Department of Public Safety (DPS) testified that, on January 28, 2013, he was working in East Montgomery County when the dispatcher informed him of the accident in question. Larson explained that by the time he arrived at the scene, in addition to the wrecked van, he found a wrecker, a sheriff's deputy, and another vehicle at the scene. According to Larson,

7

the van was in the westbound ditch, and it had initially struck a guardrail or a construction barrel. At trial, Larson identified Hoff as the driver of the van.

Larson testified that he asked Hoff what happened, and "[s]he said [a] car came over and she moved." Larson further explained that Hoff told him she was coming back from her doctor's office in Houston and that she was going to a friend's house to get the oil in her car changed. However, according to Larson, the location of the friend's house was in the opposite direction from the direction in which Hoff had been traveling. Larson told Hoff that Larson had learned of the accident at about 1:30 p.m. And, Hoff then indicated that she estimated the time of the accident to be about 1:40 p.m., which Larson regarded as odd.

Larson testified that Hoff told him she took Soma and Lorcet for back pain right after she left Houston, which was about twenty minutes before the accident, and that she had also taken Ibuprofen and Hydrocodone earlier in the day. According to Larson, Hoff's pupils were small, she "seemed to sway while she . . . was standing[]," and she had "basically a confused demeanor" and a "blank look on her face." Larson also testified that Hoff's speech was slurred and her responses to his questions were slow.

Larson explained that he is a field sobriety test instructor and that he was certified to perform field sobriety tests. He indicated that he had worked on cases

8

before in which the driver was intoxicated after taking Soma, Hydrocodone, or Clonazepam. Larson explained he administered the horizontal gaze nystagmus (HGN) test, the walk-and-turn test, and the one-leg-stand test to Hoff. According to Larson, Hoff showed no signs of intoxication on the HGN test, but she manifested six clues out of a possible eight on the walk-and-turn test, and she manifested three clues on the one-leg-stand test. Larson explained that he also administered the Romberg test, in which he asks a person to tilt her head back, close her eyes and estimate the passage of thirty seconds. According to Larson, Hoff's time estimate was about a minute and three seconds, which he described as "substantially longer[]" than normal.

Larson agreed that, based on his training and experience with people who are intoxicated from taking Soma, Hydrocodone, or Clonazepam, the signs of intoxication he observed in Hoff on the day of the accident, were consistent with the medications that she said she had taken. Larson further explained that, based on Hoff's performance on field sobriety tests, his interaction with Hoff, and the fact that Hoff had driven off the road, Larson concluded that Hoff had lost the normal use of her mental and physical faculties, which Larson believed was the result of Hoff having ingested prescription medication. Larson testified that, after placing Hoff under arrest, he read her the statutory DIC-24 warnings.

9

Larson also testified that a camera in his vehicle made a video recording of the events at the scene, and the video was admitted as State's Exhibit 3 and published to the jury. Segments of the video include Larson reading the DIC-24 warnings to Hoff after placing her under arrest, after which the following exchange occurred:

> THE TROOPER: . . . I am now requesting a specimen of your blood?
>
> MS. HOFF: What is that?
>
> THE TROOPER: Whether or not you want to give a blood specimen.
>
> MS. HOFF: Uh, what happens to the breathalyzer test?
>
> THE TROOPER: That's for alcohol. Like -- I mean, I don't think you're on alcohol.
>
> MS. HOFF: No.
>
> THE TROOPER: Right. I mean, that's why I'm not asking for --
>
> MS. HOFF: I'll give blood, whatever. Do I need to do this before I speak with my attorney?
>
> THE TROOPER: Yes, ma'am. We'll have to go down to the hospital. It's not me who is going to be taking it, it will be a nurse or doctors, something like that. Let me read this to you before we do anything else. It's basically your Miranda rights.

Larson testified that, after Hoff consented to provide a blood specimen, he took her to Kingwood Medical Center where a nurse performed a blood draw.

10

Testimony of Dawn Allgood

Dawn Allgood (Allgood), a nurse and manager of the Emergency Department at Kingwood Medical Center, testified that she was on duty on January 28, 2013. Allgood testified that she was asked to take a blood sample from Hoff, and that she complied with the request and obtained blood from Hoff.

Testimony of Sarah Martin

Sarah Martin (Martin), a forensic scientist from the toxicology department of the DPS crime lab in Austin, also testified at trial. Martin explained that she has a B.S. and M.S. in forensic science, has had "extensive" on-the-job training at DPS, has given oral and poster presentations on drug detection, has co-authored several articles, and that she has testified as an expert in forensic chemistry twenty times. Martin also testified that her training included the effects of drugs on the body, and she agreed that a scientist working in her lab would be required to know how to test for drugs and the effects of drugs on the body.

According to Martin, in the testing process, when a substance is identified in a sample, a confirmation test is performed. Martin testified that she received Hoff's blood specimen on February 5, 2013, she performed a first test on March 26, 2013, and she performed a second test on August 1, 2013. Martin reported that the initial testing of Hoff's sample showed the presence of "the Carisoprodol/Meprobamate

11

category as well as an Opiate category" as well as "a slight response for Benzodiazepines[.]" In her second testing, she found "Carisoprodol, Clonazepam, Hydrocodone and Meprobamate." Martin also explained that, sometime after testing Hoff's sample, her lab determined that the calibration of Clonazepam and Hydrocodone were high and the lab decided to report only the presence of these drugs and not their quantity. Consequently, the lab issued an amended report. According to Martin, such calibration inaccuracies affect test results regarding the quantity of a drug in a sample but do not affect test results regarding the presence of a drug in a sample. Martin's amended report was admitted as State's Exhibit 13.

Martin explained that Carisoprodol is prescribed as Soma, a muscle relaxer, and that Soma and Meprobamate have similar effects on the body. According to Martin, Carisoprodol "could produce drowsiness, dizziness, stumbling around, slurred speech, blurred vision . . . [and] a lack of coordination." And, Martin agreed that Carisoprodol would have the potential to impair a person's ability to operate a motor vehicle. Martin testified that Meprobamate produces "the typical depressant effects, slurred speech, blurred vision, dizziness, [and] drowsiness[.]" Martin explained that Carisoprodol and Meprobamate can cause impaired driving when the drug levels are higher than ten milligrams per liter and that Hoff's combined level of the substances was about fifteen milligrams per liter.

Martin testified that Clonazepam is a benzodiazepine, which is a central nervous system (CNS) depressant and is prescribed for anxiety or seizures. According to Martin, Clonazepam "has the typical CNS depressant effects[,] [] stumbling around, slurred speech, blurred vision, drowsiness, dizziness, lack of coordination." Martin agreed that Clonazepam would affect driving by producing delayed reactions or interfere with a driver's ability to observe surroundings.

Martin explained that Hydrocodone is an opiate and produces depressant effects "just like the Carisoprodol and Clonazepam and Meprobamate." Martin further explained that the drugs detected in Hoff's sample have additive effects that are "greater and possibly more impairing th[a]n just one by itself. So, their effects kind of stack up on top of each other."

The defense called no witnesses. The jury found Hoff guilty of driving while intoxicated, third or more, and also found "beyond a reasonable doubt that the Defendant used or exhibited a deadly weapon during the commission of the offense." Hoff elected to have the court assess punishment. She pleaded "not true" to the enhancements for two prior felony convictions. After a hearing on punishment, the trial court found the enhancement allegations to be "true" and assessed Hoff's punishment at fifteen years of confinement. *See* Tex. Penal Code Ann. § 12.42(d) (West Supp. 2016). Hoff timely appealed, raising five issues.

RIGHT TO COUNSEL

In her first issue, Appellant argues that the trial court erred by not suppressing certain statements she made and evidence collected after she "unambiguously invoked her right to counsel." According to Appellant, after the state trooper arrested her and read the statutory DIC-24 warnings, the trooper asked her to provide a blood specimen. Appellant argues she "unequivocally" asserted her right to counsel by asking the trooper, "Should I do this before I speak to my attorney." Appellant explains that "whether the Appellant provided any consent for a blood draw is immaterial, she no longer should have been questioned[,]" and her statements and blood-draw evidence should have been suppressed. She argues that, under the Sixth Amendment,[1] her statements and blood-draw evidence were illegally obtained. Appellant does not make a Fifth Amendment[2] argument in her appellate brief, but Appellant cites to *Edwards v. Arizona*, 471 U.S. 477 (1981) in support of her "right to counsel" argument. *See id.* at 481-82 (an accused has a Fifth Amendment right to have counsel present during custodial interrogation).

---

[1] The Sixth Amendment provides in relevant part that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const., amend. VI.

[2] The Fifth Amendment provides in relevant part that "No person shall be . . . compelled in any criminal case to be a witness against himself. . . ." U.S. Const., amend. V. This right includes the right to counsel during a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 471 (1966); *Pecina v. State*, 361 S.W.3d 68, 74-75 (Tex. Crim. App. 2012).

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court's findings of historical fact and reviewing de novo the trial court's application of the law. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When the trial judge makes express findings of fact, we view the evidence in the light most favorable to the court's ruling and determine whether the evidence supports the factual findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). "We will sustain the trial court's ruling if that ruling is 'reasonably supported by the record and is correct on any theory of law applicable to the case.'" *Id.* at 447-48 (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

"[T]he Fifth Amendment right to interrogation counsel is triggered by the *Miranda* warnings that police must give before beginning any custodial questioning. The Sixth Amendment right to trial counsel is triggered by judicial arraignment or Article 15.17 magistration." *Pecina v. State*, 361 S.W.3d 68, 71 (Tex. Crim. App. 2012). "Among the rights about which the police must advise a suspect whom they have arrested is the right to have counsel present during any police-initiated interrogation." *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). Once a suspect has invoked her Fifth Amendment right to counsel, police interrogation must cease

15

until counsel has been provided or the suspect herself reinitiates a dialogue. *Id.* (citing *Edwards*, 451 U.S. at 484-85). However, in the context of an arrest for driving while intoxicated, a police officer's request for a suspect to take a blood-alcohol test is not an interrogation within the meaning of *Miranda*. *See Griffith v. State*, 55 S.W.3d 598, 603 (Tex. Crim. App. 2001) (citing *South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983)).

Not every mention of a lawyer is sufficient to invoke the Fifth Amendment right to the presence of counsel during questioning. *See Gobert*, 275 S.W.3d at 892 (citing *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995) ("[T]he mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel.")). An ambiguous or equivocal statement with respect to counsel does not require officers to seek clarification, nor does it require the officers to halt their interrogation. *Id.* at 892 (citing *Davis v. United States*, 512 U.S. 452, 461-62 (1994)). Whether the mention of a lawyer constitutes a clear invocation of the right to counsel depends upon the statement itself and the totality of the surrounding circumstances. *Id.*

Prior to trial, Hoff filed a motion to suppress, arguing that the statements Hoff made and evidence obtained from her should be suppressed as illegally

obtained under the Fifth and Sixth Amendments.[3] Before the trial began, the court conducted a hearing on Hoff's motion to suppress. While not issuing findings of fact and conclusions of law, in denying the motion, the trial court explained on the record that "I do not find that her question: Do I need to do this after I speak with my attorney was an unambiguous invocation of her right to counsel."

Hoff's statement to the trooper, wherein she asked "[d]o I need to do this before I speak to my attorney[,]" was made prior to any judicial arraignment or Article 15.17 proceeding and therefore the Sixth Amendment right to counsel was not triggered at that time. *See Pecina*, 361 S.W.3d at 71; *Griffith*, 55 S.W.3d at 603. The record reflects that Larson requested a blood specimen and Hoff agreed to provide a blood sample before Larson read Hoff the *Miranda* warnings. Based upon the record before us, we conclude that Appellant's question, "do I need to do this before I speak with my attorney?," was not produced by a custodial interrogation and Appellant had no Fifth Amendment right to counsel at that time. *See Griffith*, 55 S.W.3d at 603. Hoff's question to the trooper occurred before Hoff's Fifth Amendment right to counsel attached. *See Pecina*, 361 S.W.3d at 71.

---

[3] Hoff's motion to suppress also cited other sections of the federal constitution, the Texas constitution, and numerous state statutes. We address herein only those arguments made by Hoff on appeal concerning the right to counsel. *See* Tex. R. App. P. 47.1.

Additionally, we further conclude that the trial court did not abuse its discretion in concluding that the question Hoff asked the trooper would not constitute, under the totality of the circumstances, an unambiguous request for an attorney. Hoff's question did not constitute a clear invocation of her right to counsel, nor did it require the police officer to halt the blood draw. *See Gobert*, 275 S.W.3d at 892.[4] We conclude that the trial court did not err in overruling Hoff's motion to suppress. We overrule Appellant's first issue on appeal.

---

[4] *See also, e.g.*, *Davis v. United States*, 512 U.S. 452, 455, 458-62 (1994) (a suspect's statement "Maybe I should talk to a lawyer" was ambiguous and did not invoke the right to counsel); *Davis v. State*, 313 S.W.3d 317, 338-41 (Tex. Crim. App. 2010) (under the totality of the circumstances, a suspect's statement "I should have an attorney" was not an unambiguous request for counsel); *Mbugua v. State*, 312 S.W.3d 657, 665 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("Can I wait until my lawyer gets here?" did not clearly state a firm, unambiguous, and unqualified condition that any further questioning must be conducted only with his attorney present); *Flores v. State*, 30 S.W.3d 29, 33-34 (Tex. App.—San Antonio 2000, pet. ref'd) (a suspect's question "Will you allow me to speak to my attorney before?" was neither clear nor unequivocal about his desire to speak to an attorney); *Cooper v. State*, 961 S.W.2d 222, 226 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) ("Where is my lawyer? Where is he?" was not an unequivocal assertion of the right to counsel); *accord Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999) (question "Do you think I need an attorney here?" posed to police officer during interrogation was an ambiguous query whether his interrogator thought that counsel might be helpful and not a clear assertion of his right to counsel); *Diaz v. Senkowski*, 76 F.3d 61, 63-64 (2d Cir. 1996) (question "Do you think I need a lawyer?" was not a clear invocation of the right to counsel); *United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994) (a suspect asking if he "should see a lawyer" has not clearly invoked his right to counsel); *United States v. March*, 999 F.2d 456, 460 (10th Cir. 1993) (defendant's question "Do you think I need an attorney?" did not constitute an unequivocal request for an attorney).

DEADLY-WEAPON FINDING

In her second issue, Appellant argues that the trial court erred in allowing a deadly-weapon instruction to be submitted to the jury because the State did not present sufficient evidence to support such an instruction. Citing to *Cates v. State*, 102 S.W.3d 735 (Tex. Crim. App. 2003), Appellant argues that "there is no evidence that Appellant used the vehicle in a reckless, dangerous or careless manner" and no evidence that others were actually endangered. At trial, the defense objected to the deadly-weapon instruction and argued:

> [t]here was no evidence from the Beards who testified about the initial accident[] [t]hat they were in danger or that -- that others were actually in danger if they had been present. No evidence at all. And that merely hypothetical potential was, if anything, testified about, but nothing more than that. So, my feeling is, I believe it's very clear, there was no evidence at all regarding a deadly weapon from the State that should be allowing in the Court's Charge to that effect.

In this case, we must decide whether, in viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Hoff used or exhibited her vehicle as a deadly weapon when she was driving while intoxicated. *See Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009) (citing *Cates*, 102 S.W.3d at 738). A deadly weapon is "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(A)

19

(West Supp. 2016). A deadly weapon is also "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" *Id.* § 1.07(a)(17)(B). Objects that are not usually considered dangerous weapons may become so depending on the manner in which they are used during the commission of an offense. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). A motor vehicle is not a deadly weapon *per se*, but it may be found to be a deadly weapon if used in a manner capable of causing death or serious bodily injury. *See Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014); *Drichas*, 175 S.W.3d at 798; *Cates*, 102 S.W.3d at 738 ("An automobile can be a deadly weapon if it is driven so as to endanger lives."). Specific intent to use a motor vehicle as a deadly weapon is not required. *Drichas*, 175 S.W.3d at 798. The danger posed to motorists must be actual and not simply hypothetical. *Id.* at 799. "Actual danger" refers to the risk of "death or serious bodily injury." *Brister*, 449 S.W.3d at 494. "Capability is evaluated based on the circumstances that existed at the time of the offense." *Drichas*, 175 S.W.3d at 799. Merely driving while intoxicated, without more, does not establish that the vehicle is a deadly weapon. *See Brister*, 449 S.W.3d at 495.

A "deadly-weapon finding is justified if a rational jury could have concluded that the appellant's vehicle posed an actual danger of death or serious bodily

injury." *Brister*, 449 S.W.3d at 494 (citing *Sierra*, 280 S.W.3d at 254, 256-57). To determine whether the evidence supports a deadly-weapon finding in a case involving a motor vehicle, we conduct a two-part analysis. *Hilburn v. State*, 312 S.W.3d 169, 177 (Tex. App.—Fort Worth 2010, no pet.) (citing *Sierra*, 280 S.W.3d at 255). First, we evaluate the manner in which the defendant used the motor vehicle during the felony, considering factors such as (1) intoxication, (2) speeding, (3) disregarding traffic signs and signals, (4) driving erratically, and (5) failing to control the vehicle." *Sierra*, 280 S.W.3d at 255. Second, we "consider whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury." *Id.* To satisfy the second inquiry, there must be evidence that "1) the object meets the definition of a deadly weapon; 2) the deadly weapon was used or exhibited during the transaction on which the felony conviction was based; and 3) other people were put in actual danger." *Brister*, 449 S.W.3d at 494 (citing *Drichas*, 175 S.W.3d at 798).

In *Brister*, the evidence in the record showed that

> . . . appellant briefly crossed the center line into the oncoming lane of traffic at a time at which there were very few, if any, cars in that lane. After the officer activated his emergency lights, appellant committed no other traffic offenses and appropriately stopped. There is no testimony that appellant caused another vehicle or person to be in actual danger.

21

*Id.* at 495. Because there was no evidence that the appellant caused another vehicle or person to be in actual danger, the Court of Criminal Appeals determined "there was no reasonable inference that appellant used his motor vehicle as a deadly weapon." *Id.* Likewise, in *Foley v. State*, the Corpus Christi Court of Appeals rejected a deadly-weapon finding when there was no evidence in the record that a person or vehicles were "in the immediate vicinity of Foley's crash." *Foley v. State*, 327 S.W.3d 907, 917 (Tex. App.—Corpus Christi 2010, pet. ref'd).

By contrast, in *Drichas*, the evidence was sufficient to support a deadly-weapon finding where the evidence showed that Drichas led law enforcement officers on a fifteen-mile high-speed chase, "drove erratically, wove between lanes and within lanes, turned abruptly into a construction zone, knocking down barricades as he did so, and drove on the wrong side on the highway." 175 S.W.3d at 797-98. Similarly, in *Mann v. State*, the evidence was sufficient because it established that Mann "nearly hit another vehicle head-on and that a collision was avoided only because the other driver took evasive action." 58 S.W.3d 132, 132 (Tex. Crim. App. 2001). Accordingly, the evidence was sufficient to support a deadly-weapon finding. *Id.*

On appeal, Hoff argues that there is no evidence she used her vehicle in a reckless, dangerous, or careless manner and no evidence that the Beards witnessed

22

that other people were put in actual danger. We disagree. The facts of this case are more analogous to *Drichas* and *Mann*, than *Brister*. In the case at bar, there was testimony from Sudie and Roland, eyewitnesses to Hoff's accident, from which a jury could reasonably conclude that Hoff drove in a dangerous manner and that someone other than Hoff was placed in actual danger. Sudie testified that Hoff was going faster than the Beards' vehicle, although neither Sudie nor Roland could testify that Hoff was speeding. Both Sudie and Roland testified that Hoff was driving erratically, and that Hoff hit multiple objects. According to Sudie, Hoff hit a barrel and a guardrail, and then Hoff's vehicle ricocheted off the guardrail back into traffic, went off the road, into a ditch, and hit a tree. Roland testified that Hoff's lane change was "abrupt" and that Hoff's vehicle "whipped" into the lane in front of the Beards' vehicle, and Roland slowed down to avoid getting too close to Hoff's vehicle. Roland also testified that Hoff 's vehicle continued to appear as if it kept veering to the right, even after striking the guardrail, that Hoff's vehicle actually hit a guardrail and a barrel, and eventually left the roadway and hit a tree. According to Roland, the traffic was either "moderate" or "really, really active[]" that day, and drivers commonly go "[a] little fast[]" on that stretch of road.

Accordingly, the evidence reasonably gives rise to an inference that Hoff drove in a dangerous manner based on the evidence which established she was

23

intoxicated, she drove erratically, she failed to control her vehicle, she hit a barrel and ricocheted off of the guardrail, and crashed into a tree. The record and testimony from the eyewitnesses also indicates that Hoff's vehicle actually passed the Beards' vehicle, and that after Hoff's vehicle made the abrupt lane change into the Beards' lane, the Beards continued to remain behind Hoff's vehicle, where the Beards continued to observe Hoff's erratic driving and eventual crash. A reasonable jury could conclude on the evidence that other people (including Sudie and Roland Beard) were put in actual danger of death or serious bodily injury. Viewing the evidence in a light most favorable to the verdict, a jury could have reasonably inferred that Hoff used her vehicle as a deadly weapon during the commission of the offense, and the evidence is legally sufficient to support the deadly-weapon finding. *See Sierra*, 280 S.W.3d at 256. We overrule Appellant's second issue on appeal.

ADMISSION OF SCIENTIFIC EVIDENCE

Appellant's third issue brings multiple challenges to the admission of DPS forensic scientist Sarah Martin's testimony. Appellant argues the State failed to properly qualify Martin under *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). According to Appellant, Martin was not qualified under *Kelly* because Martin did not address the validity of the underlying scientific theory for the

24

procedures she employed in analyzing Hoff's blood specimen. Appellant also argues that Martin was not qualified to address the physiological effects of prescription drugs. Finally, Appellant argues that certain analytic "irregularities" discovered more than a year after Hoff's arrest violated Hoff's due process rights under the Fourteenth Amendment and denied her a fair trial.

We review the admission of evidence, including expert testimony, under an abuse of discretion standard. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010); *Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996). Error may not be predicated on a ruling that admits evidence unless a party's substantial rights are affected. Tex. R. Evid. 103(a); *see* Tex. R. App. P. 44.2(b). We will not reverse if, after examining the entire record, we have fair assurance that the error did not influence the jury or had but slight effect. *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

Validity of the Underlying Scientific Theory

For scientific evidence "to be considered sufficiently reliable as to be of help to a jury," the proponent must satisfy three criteria by clear and convincing evidence: "(1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly

applied on the occasion in question." *Reynolds v. State*, 204 S.W.3d 386, 390 (Tex. Crim. App. 2006) (citing *Kelly*, 824 S.W.2d at 573).

Hoff failed to object at trial to the results of Martin's analysis of Hoff's blood specimen on grounds that the analysis was not scientifically reliable under *Kelly* or Rule 702. Hoff's trial objections were limited to hearsay and to Martin's qualification to testify about the effects of drugs on the body. Therefore, Appellant has failed to preserve for our review her complaint that the analysis used by the expert was not scientifically reliable. *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Gregory v. State*, 56 S.W.3d 164, 182 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd) (lack of a specific objection at trial to the admission of scientific evidence was insufficient to preserve error).

Nevertheless, even if such objection had been preserved, Martin testified at trial and provided a detailed explanation of the blood-testing procedure, and Martin explained that the method she used is widely accepted in the scientific community. On the record before us, we conclude that the trial court did not abuse its discretion in admitting the results of testing on Hoff's blood specimen.

Testimony on the Physiological Effects of Drugs

A witness is qualified as an expert by knowledge, skill, experience, training, or education. *See* Tex. R. Evid. 702. The expert must have a sufficient background

26

in a particular field, and the witness's background should relate to the matter on which the witness is to offer an opinion. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010). "The focus is on the fit between the subject matter at issue and the expert's familiarity with it." *Id.* "Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case." *Id.* If a witness is not testifying as an expert, opinion testimony is limited to opinions that are rationally based on the witness's perception and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Tex. R. Evid. 701.

At trial, Martin explained that she has a B.S. in forensic chemistry and an M.S. in forensic science as well as extensive on-the-job training. Martin has been trained regarding the physiological effects of drugs on the body, and Martin explained that as a scientist who works in this area for the DPS, she would be required to know the effects of drugs, as well as how to test for drugs. We conclude that the trial court did not err in overruling the objection that Hoff made to Martin's qualifications or in concluding that Martin was qualified to testify regarding the physiological effects of the drugs in question.

<u>The Amended Report</u>

Martin testified that, after having performed the initial analysis on Hoff's blood sample, the lab determined that the calibration of the amount of Clonazepam and Hydrocodone in the blood was high. As a result, the lab issued an amended report that then included only the presence of these two drugs and not the quantity of each. At trial, Hoff objected to the State's reliance on the amended report as follows:

> THE COURT: . . . Your complaint is that you did not receive notice of this, but that it changed?
>
> [Defense attorney]: Not only that it changed, but it denies me the right of cross-examination of why it changed. I was told by the State that it was changed because they were going to do -- the calibration was off and they were going to redo all of the drugs. They didn't do that. They just did two of the drugs. So, it denied me the right to cross-examine -- to confront the witness in this case, which would be Ms. Martin.
>
> THE COURT: She's here.
>
> [Defense attorney]: I know she's here now.
>
> THE COURT: You have an opportunity for cross in just a minute.
>
> [Defense attorney]: At the time, I was told there was going to be no --
>
> THE COURT: So, how has that -- how has that hurt you?
>
> [Defense attorney]: Well, I think it's harmed my client because now we got a second report and actually did not retest it the first two parts --

28

THE COURT: Actually, Mr. [Defense attorney] [], when did you get that second report?

[Defense attorney]: It doesn't matter when I got it, Judge.

THE COURT: Don't tell me that.

[Defense attorney]: I'm saying it doesn't matter when I got it. The fact is that I was told that they retested it. And I was told that it was retested to the same amount. Instead I was told that they didn't retest it. And it's the same amount because it's the same amount that they originally tested it for.

THE COURT: I don't find that that jeopardizes your client at all. And you have this witness here. And so, you may question her as to whatever you want to do about that second report.

An issue on appeal must comport with the objection made at trial, and an objection stating one legal basis may not be used to support a different legal theory on appeal. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). Thus, when an appellant's trial objection does not comport with her argument on appeal, she forfeits her right to raise the new argument on appeal. *See Clark*, 365 S.W.3d at 339; *Goff v. State*, 931 S.W.2d 537, 551 (Tex. Crim. App. 1996).

On appeal, Appellant suggests Hoff's objection at trial (excerpted above) includes an objection alleging she was denied the right to cross-examine and confront witnesses, which invokes a right protected by the Sixth Amendment. *See* U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36 (2004). On appeal,

29

she argues that she has been denied due process and a fair trial because she was under the impression that the DPS lab was going to retest the quantity of drugs after it detected a calibration error, but instead the lab issued an amended report, thereby denying her a fair trial. Hoff's appellate argument does not comport with her objection at trial.[5] *See Clark*, 365 S.W.3d at 339; *Goff*, 931 S.W.2d at 551. Additionally, Hoff has failed to explain with specificity how the State's decision not to retest her blood specimen denied her due process. *See* Tex. R. App. P. 38.1(h). We overrule Appellant's third issue.

## SUFFICIENCY OF EVIDENCE OF INTOXICATION

In her fourth issue, Appellant argues that the State failed to present sufficient evidence of intoxication. More specifically, she argues that (1) evidence of her alleged extrajudicial admission alone was not sufficient evidence and Appellant argues that the evidence at trial failed to satisfy the *corpus delicti* rule, and (2) other testimony demonstrated only that Hoff was "impaired" and not "intoxicated" at the time she was arrested. Appellant argues that, as a consequence, the evidence at trial failed to satisfy the *corpus delicti* rule.

---

[5] Appellant's brief appears to argue that she brought a Fourteenth Amendment due process challenge in her motion to suppress filed before trial. But the motion to suppress does not include such an argument. Furthermore, her motion to suppress was filed on April 8, 2013, well before the DPS crime lab issued its amended report on May 15, 2014.

In order to determine if the evidence is legally sufficient, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). The factfinder may choose to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

A person commits the offense of driving while intoxicated when she operates a motor vehicle in a public place while intoxicated. Tex. Penal Code Ann. § 49.04(a). "Intoxicated" means not having the normal use of mental or physical faculties by reason of the introduction of alcohol or a controlled substance. *Id.* § 49.01(2)(A) (West 2011). Penal Code section 49.04, entitled "Driving While Intoxicated[,]" requires the State to prove that a defendant lost her faculties by reason of the introduction of a substance into her body, but it does not require the State to prove what substance caused the loss of the normal use of mental or physical faculties. *Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004). A conviction for the offense of driving while intoxicated may be supported solely by

circumstantial evidence. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Evidence of a controlled substance in a defendant's blood is relevant, when the State presents testimony from which a juror reasonably could determine that a drug affected the defendant's intoxication. *See Bekendam v. State*, 441 S.W.3d 295, 302 (Tex. Crim. App. 2014).

"The *corpus delicti* rule is one of evidentiary sufficiency affecting cases in which there is an extrajudicial confession." *See Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015) (citing *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013)). The rule requires evidence independent of the defendant's extrajudicial confession to establish that the defendant was guilty of the crime for which the jury convicted her. *Id.*; *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002). In prosecutions for the offense of driving while intoxicated, the *corpus delicti* rule requires proof that the defendant operated a motor vehicle in a public place while intoxicated. *Layland v. State*, 144 S.W.3d 647, 650-52 (Tex. App.—Beaumont 2004, no pet.). Hoff admitted to the officers at the scene of the accident that she had taken Soma and Lorcet approximately twenty minutes before the accident and that she had taken Hydrocodone earlier in the day. Under the *corpus delicti* rule, we examine the record to determine whether there was evidence of intoxication other than Hoff's own statements that she had taken the drugs.

The record contains the testimony of eyewitnesses who described Hoff's driving and the details of the accident, as well as testimony from Deputy O'Connor and Trooper Larson, who not only spoke with Hoff at the scene but also observed her demeanor immediately after the accident. Officer Larson testified regarding the results of the field sobriety tests, his observance of clues of intoxication, and the State presented testimony and testing results regarding Hoff's intoxication. Sudie testified that she observed Hoff driving erratically, and Sudie observed Hoff's van hit a barrel, hit a guardrail and "ricochet" off the guardrail, drive into a ditch, and hit a tree. According to Sudie, Hoff had a "dazed" or "puzzled" appearance. Roland also testified that he observed Hoff's vehicle hit a barricade barrel, make an abrupt lane change, hit a guardrail, and hit a tree. Deputy O'Connor testified that he suspected that Hoff was driving while intoxicated in part based on the fact that Hoff handed him a pill bottle instead of her driver's license. O'Connor also testified that Hoff handed him a bag that contained prescription medication. Finally, Trooper Larson testified that he performed field sobriety tests on Hoff, and she exhibited multiple clues of intoxication on each test. Larson also explained that, based on Hoff's performance on the field sobriety tests, his overall interaction with Hoff, and the fact that Hoff had driven off the road, he concluded that Hoff

had lost the normal use of her mental and physical faculties after taking prescription medication.[6]

Martin testified that Hoff's blood specimen tested positive for the presence of Carisoprodol, Clonazepam, Hydrocodone, and Meprobamate, and, according to Martin, these four substances, singly or in combination, can impair a person's ability to operate a motor vehicle. Accordingly, we conclude that there was sufficient evidence independent of Hoff's extrajudicial statements or admissions that supports the jury's finding that Hoff was intoxicated. We overrule Appellant's fourth issue.

EXCESSIVE PUNISHMENT

In her fifth and final issue, Appellant argues that the trial court's assessment of punishment was "cruel and unusual" because it was "grossly disproportionate" to the crime. She argues that the sentence assessed was excessive because (1) the accident giving rise to the arrest "was not thoroughly investigated and, therefore, a mechanical malfunction could not be eliminated[,]" (2) Hoff is the primary

---

[6] Appellant did not challenge the qualifications of the officer on this point. We note that even if such objection had been made, the erroneous admission of testimony from an unqualified witness is harmless where another expert provides similar testimony. *See Paradoski v. State*, 477 S.W.3d 342, 351 (Tex. App.— Houston [14th Dist.] 2015, no pet.) (citing *Jones v. State*, 111 S.W.3d 600, 604-05 (Tex. App.—Dallas 2003, pet. ref'd) and *Riley v. State*, 988 S.W.2d 895, 899 (Tex. App.—Houston [14th Dist.] 1999, no pet.)).

34

caregiver for her two young children, and (3) Hoff's criminal history is "not extremely bad."

In the case at hand, Appellant was convicted for a third time of driving while intoxicated, a third degree felony, and her sentence was enhanced by two prior felony convictions under section 12.42(a) of the Texas Penal Code. *See* Tex. Penal Code Ann. §§ 49.04, 49.09(b). She faced a punishment range between two and twenty years' imprisonment for her conviction because the trial court found that Appellant was previously convicted of two non-sequential felonies. *See* Tex. Penal Code Ann. §§ 12.33(a) (West 2011), 12.42(a) (West Supp. 2016).

The legislature is vested with the power to define crimes and prescribe penalties. *Davis v. State*, 905 S.W.2d 655, 664 (Tex. App.—Texarkana 1995, pet. ref'd); *see also Simmons v. State*, 944 S.W.2d 11, 15 (Tex. App.—Tyler 1996, pet. ref'd). Punishment that falls within the limits prescribed by a valid statute, including punishment enhanced pursuant to a habitual-offender statute, is not excessive, cruel, or unusual. *See Ex parte Chavez*, 213 S.W.3d 320, 323-24 (Tex. Crim. App. 2006); *Harris v. State*, 656 S.W.2d 481, 486 (Tex. Crim. App. 1983); *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); *Davis*, 905 S.W.2d at 664; *see also Samuel v. State*, 477 S.W.2d 611, 614-15 (Tex. Crim. App. 1972).

To preserve error for review, a defendant must make a timely, specific objection at trial. Tex. R. App. P. 33.1(a). Generally, a party's failure to make a timely objection in the trial court forfeits the complaint on appeal. *Collins v. State*, 378 S.W.3d 629, 631 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Even constitutional errors may be waived by failure to object at trial. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Texas courts have established that failure to raise an Eighth Amendment cruel-and-unusual-punishment claim at the trial level waives the claim on appeal. *See Saldano v. State*, 70 S.W.3d 873, 891 (Tex. Crim. App. 2002); *Arriaga v. State*, 335 S.W.3d 331, 334 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Williamson v. State*, 175 S.W.3d 522, 523-24 (Tex. App.—Texarkana 2005, no pet.) (motion for new trial is appropriate way to preserve disproportionality claim for appellate review). Such claims have been held not to be so fundamental as to relieve an appellant of the requirement of a timely, specific objection at trial. *See Curry v. State*, 910 S.W.2d 490, 497-98 (Tex. Crim. App. 1995); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd).

There is no indication in the record before us that Appellant raised this objection at trial. Because Appellant did not make an objection to her sentence on cruel-and-unusual-punishment grounds at trial, she has failed to preserve this issue

for review. Furthermore, the trial court assessed punishment at fifteen years in this case, which is within the statutory range. *See* Tex. Penal Code Ann. §§ 12.33(a), 12.42(a). Therefore, the punishment assessed is not prohibited as cruel and unusual punishment, nor is it *per se* excessive. *See Samuel*, 477 S.W.2d at 614-15; *see also State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016) (where appellant's sentence "fell well within the statutory range . . . there is no reason to compare his sentence to sentences imposed on others"). We overrule Appellant's fifth issue.

We affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice


Submitted on July 14, 2016
Opinion Delivered October 19, 2016
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, J.J.